Emmanuel **JOHNSON**, Plaintiff,

v.

Charles C. **MADDOX**, Defendant.

No. 00–2743 (JMF).

United States District Court, District of Columbia.

July 9, 2003.

Michael Wayne Beasley, Falls Church, VA, for plaintiff.

Emanuel Johnson, Jr., Woodbridge, VA, pro se.

Eric Mark Jaffe, Gordon Michael Harvey, U.S. Attorney's Office, Fred E. Haynes, Washington, DC, Teresa J.A. Quon, David A. Jackson, Office of Corporate Counsel, D.C., for defendant.

## FINDINGS OF FACT

FACCIOLA, United States Magistrate Judge.

1. Plaintiff, Emmanuel Johnson ("Johnson"), an African American male, retired from the Federal Bureau of Investigations ("FBI") on May 3, 1999. Johnson had been assigned to the Washington Field Office ("WFO").[1]

2. James C. Carter ("Carter"), an African American, was the Assistant Director in Charge of the WFO and was Johnson's supervisor in the WFO.

3. Johnson was lead plaintiff in a class action, racial discrimination and retaliation case prosecuted in this Court under the caption *Emmanuel Johnson, Jr. v. Reno,* Civil Action NO. 93–0206(TFH). This Title VII action is commonly known as the BADGE litigation, BADGE being an acronym for "Black Agents Don't Get Equality."

4. The BADGE suit was settled in 1993.

5. Johnson has filed seven EEO complaints and named Carter as the alleged discriminating official in two of them. Both have ripened into law suits that are pending in this Court.

6. When E. Barrett Prettyman was Inspector General of the District of Columbia, Johnson sought a position with the office but did not receive it.

7. Charles C. Maddox ("Maddox"), having served as Acting Inspector General, became the Inspector General on May 19, 1999. Upon the recommendation of Richard Sullivan, who was then serving as Deputy Inspector General and who had known Johnson when they served in the Marines and in the FBI, Maddox hired Johnson to work as a Criminal Investigator in the Office of the Inspector General by a letter of employment mistakenly dated May 28, 1998. (It should have been May 28, 1999).

8. Maddox, an African American, was aware of the existence of the BADGE litigation but not of its specific details. Maddox had himself confronted racial problems when he was serving in the United States Secret Service. He testified that when he first applied to become an agent in the early 1970's, the clerk who accepted his application and test returned moments later to tell him that he had flunked. Maddox recalled her look of astonishment that

---

**1.** Finding of fact based on the parties *Joint*    *Trial Stipulations* appear in bold.

an African American would even apply for the position of Special Agent.

9. Arthur Andersen ("Andersen"), another former FBI agent in the WFO, became General Counsel of the Office of Inspector General on June 1, 1999. He currently holds the position of Deputy Inspector General.

10. Andersen was aware of the BADGE litigation and of Johnson's being lead plaintiff because the FBI field offices received teletypes about class actions that had been filed. He was unaware that Johnson had filed EEO complaints, naming Carter as the alleged discriminating official. He never had any discussions with Carter about the BADGE litigation.

11. David M. Bowie ("Bowie"), who is African American, served with Johnson in the FBI. Upon retirement, he became Assistant Inspector General for Investigations in November, 1997. Bowie was also a plaintiff in the BADGE case.

12. Johnson began work in the Office of the Inspector General on June 21, 1999, and was initially assigned to the Public Corruption Unit.

13. On that same day, Maddox, Andersen, and Bowie met with Carter to introduce Maddox to Carter. They were joined by Alfred Miller ("Miller"). Miller, another retired FBI agent, was Deputy Inspector General for Investigations and had been Treasurer of BADGE, a District of Columbia corporation, formed to bring what became the BADGE lawsuit.

14. Maddox described this meeting with Carter as a standard "meet and greet" meeting, held by the FBI Field Office to meet with those District of Columbia agencies, such as the Police Department and the Corporation Counsel's Office, who interact with the FBI. The meeting took about 30 minutes; it had been pre-arranged by Andersen.

15. At the end of the meeting, Carter took Maddox aside for a private conversation.

16. Maddox did not think it unusual that Carter wished to speak to him without Maddox's senior staff (Andersen, Bowie and Miller) present.

17. In their private meeting, Carter, aware of Johnson's hiring, indicated that the FBI would not make its resources available to Maddox's office in any police corruption case because, in Carter's view, Johnson had a conflict of interest that might compromise his work.

18. According to Maddox, Carter indicated that their offices had a good working relationship, and that this relationship would continue. Carter insisted that what he said about Johnson had nothing to do with the BADGE suit; Maddox testified that he would not have tolerated Carter refusing FBI cooperation because of Johnson's participation in a lawsuit brought to achieve equality of treatment for African American agents. Maddox himself had been involved in similar efforts on behalf of African American Secret Service agents.

19. Maddox made no further inquiry of Carter as to the nature of the conflict of interest. He did later inquire of Andersen, Bowie, and Miller what they thought Carter meant.

20. Maddox' staff indicated that Carter might be referring to Johnson's EEO complaints or to a confidential investigation into the activities of another agent named Spivey. Spivey and Johnson were thought by Maddox's staff to be good friends.

21. Maddox indicated that his conversation with Carter convinced him to reassign Johnson from the Public Corruption Unit to the General Investigations Unit.

22. The Office of Inspector General had begun to examine the circumstances of

defendants in criminal cases who were confined in halfway houses and who eloped and then committed serious crimes. Johnson was assigned this investigation.

23. Johnson initially produced in four days an Investigative Plan for the halfway house assignment. In August, 1999, Johnson submitted his draft report. It was 150 pages long and contained 114 exhibits.

24. Johnson gave copies to Andersen, Maddox and Bowie, but Maddox never reviewed it. Maddox delegated that responsibility to Bowie. Maddox recalled that he had asked Sullivan to rewrite the report because Bowie had told Maddox that it was too long and not logical. It was not ready for review. Maddox recalled that Sullivan attempted to edit the report but could not because it needed such extensive revision.

25. Andersen, surprised at being given the report because he was not in Johnson's chain of command, but willing to work on it, discussed Johnson's draft with Sullivan. Sullivan, concerned that it had been given to Andersen, insisted that it was Bowie's responsibility, as Johnson's supervisor, to get the report in shape for the Inspector General to sign it.

26. Sullivan recalled that he received the report, that it was over 100 pages long, verbose and not well organized. He thought it needed major surgery.

27. Bowie, who ultimately got it, certainly performed major surgery. Over a period of time, and several drafts, Johnson's report was substantially reduced in size by Bowie's editing and his working with Johnson on it.

28. The report on halfway houses, however, was never completed.

29. On October 20, 1999, Johnson, doing hot line duty, received an anonymous phone call from an employee of a District of Columbia contractor who claimed that his employer was submitting invoices for payment that contained obvious double billing.

30. The Inspector General issued a subpoena duces tecum requiring the forthwith production of documents pertaining to the billing the caller had described. Johnson and another agent arrived at the business premises of the contractor. The contractor and her attorney, Charles A. Ray, arrived and there was a confrontation between the agents and Ray. Johnson insisted on the forthwith nature of the subpoena while Ray indicated that his client would have to review the documents and produce and copy those that were responsive. After Ray spoke to Andersen by phone, the agents left the premises.

31. Ray complained mightily to Andersen about Johnson's behavior, describing it as "gestapo like." Andersen was concerned about Johnson's behavior during the incident because, in Andersen's view, Johnson, a most experienced law enforcement agent, did not seem to grasp the difference between a search warrant, that permits the agent to seize whatever the warrant authorizes, and a subpoena that requires the party to collect only what is responsive. Andersen testified that Johnson was belligerent and argumentative when he discussed the incident, insisting that he had the right to seize what was in "plain view." Andersen met with Bowie and Miller about Johnson's behavior during the service of the subpoena and understood that Miller admonished Johnson for his actions.

32. Karen Bramson ("Bramson"), who is now General Counsel to the Office of Inspector General, was manning the hotline on November 9, 1999, when a caller, demanding anonymity, referred to two recent articles in the Washington Post about the possible mishandling of liquid chlorine.

He indicated that three other chemicals were being mishandled at the Blue Plains sewage treatment plant. According to the caller, equipment on the tank holding chlorine was dangerously unsafe and the main alarm horn was not working.

33. In the same call, the caller indicated that a contractor at the Blue Plains had "pushed out or let go" fourteen of its employees within the past year. The caller insisted that these persons would have information about the problems at the plant and that District of Columbia employees were trying to cover up what these employees knew about dangers at the plant. The caller also indicated that a named individual was guilty of theft and embezzlement and that an audit had been conducted showing that millions of dollars were missing.

34. Two days later, Andersen took another call in which the caller indicated that the Blue Plains Chlorine Treatment Plant did not have a functioning warning system, creating a public danger.

35. Investigation of this matter was assigned to Johnson.

36. Johnson's investigation focused on potential contractor fraud. He also ascertained that 19 of the 52 Special Police Officers working at WASA facilities had arrest records.

37. Bramson recalled attending a briefing given by Johnson about his investigation of the matters raised in the anonymous call. She indicated that his presentation was disjointed and did not flow. More significantly, she indicated that Maddox was concerned that Johnson was focusing only on the contract fraud, when he should have dealt with safety concerns first. She recalled that Maddox made her read from the memorandum of her phone conversation because Maddox did not understand what Johnson was saying in the briefing. Bramson said that the participants in Johnson's briefing were shocked that Johnson had not interviewed the person identified in the call as having information about the potential dangers at the plant.

38. Andersen also described Johnson as being unfocused during the briefing. He did not address the chemical hazards, but only a series of financial audits that had been done. Johnson had not interviewed the individuals who were said to have information about the dangers and Johnson was unable to explain why he had not. Johnson was terminated before he could complete the written report.

39. By this time, Andersen had lost faith in Johnson. Johnson continued to berate Ray, the lawyer who had accused him of "gestapo like" tactics, and Andersen was concerned that Johnson's investigation seemed to have ignored the safety concerns at the Blue Plains sewage treatment plant.

40. By 2000, Maddox himself was so concerned about Johnson's performance that he had a discussion of it at a meeting he held with Andersen, Miller, and Bowie. Maddox was most concerned over the long delay in getting the halfway house report completed,[2] the subpoena incident, and Johnson's proclivity in briefings and otherwise to go off on tangents to the main topic of the investigation he was supposed to be conducting.

41. After one such meeting, in early February 2000, Maddox asked Miller and Bowie whether they could guarantee that Johnson's performance would improve if he were to be placed on a Performance Improvement Plan for a specific period of time such as 60 to 90 days. When neither

2. Note that the report never was completed.

man would provide such a guarantee, Maddox decided to fire Johnson.

42. On or about February 7, 2000, Bowie notified Johnson that, at the direction of Maddox, Johnson would have to resign or be terminated.

43. On March 1, 2000, Johnson, having declined to resign, was terminated.

44. On August 30, 1999, Gregory Marsilio, who served as Johnson's supervisor, provided Johnson with a performance counseling appraisal of Johnson's performance. He described Johnson as an expert investigator who was outstanding. Marsilio said that Johnson required little or no supervision, was self-motivated, and a writer par excellence.

45. On November 29, 1999, Marsilio completed a performance review summary of Johnson. There were four rating levels: outstanding, exceptional, satisfactory, and unsatisfactory. On the critical element, "conduct investigations," Marsilio rated Johnson as excellent and on "report information" as satisfactory. On "liaison," Marsilio rated Johnson as exceptional.

## CONCLUSIONS OF LAW

I find no evidence of any causal connection between plaintiff's filing EEO complaints against the FBI in general and Carter in particular and Johnson's subsequent termination. I also find there is no evidence that the justification for the decision to terminate Johnson was a pretext for retaliation against Johnson for filing those EEO complaints. I will, therefore, enter final judgment for the defendant.

## ANALYSIS

■ To permit a verdict in his favor, Johnson would have to first establish "(1) that [ ]he engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) a causal

connection existed between the two." *Brown v. Brody,* 199 F.3d 446, 452–53 (D.C.Cir.1999).

■ Johnson's first problem is that he did not file a complaint against the employer who fired him, i.e., the OIG. When an employee is fired shortly after filing an EEO complaint, the proximity of those two events may in itself justify the inference that the filing of the complaint caused the firing since there is a natural inference in such a situation that an employer's motivation was retaliatory. When, however, a plaintiff files a complaint against one employer and is fired by a second, no natural inference arises that the firing in one agency is related to the filing of an EEO complaint in another. In the absence of such an inference, there must be evidence upon which a finder of fact can predicate the likelihood that the filing against the first employer motivated the firing by the second. Here there is absolutely no evidence whatsoever that Johnson's termination was in any way caused by his filing complaints against the FBI and Carter. The only evidence is that Carter, whatever his motivation, caused Johnson's reassignment from the Police Corruption Unit to the General Investigations Unit. Ironically, that reassignment hardly harmed Johnson; he was assigned to high profile, important investigations by specific direction of Maddox himself. More to the point, to find that Carter's statement to Maddox about Johnson's potential conflict of interest was the cause of Johnson's termination is to link two events together without any proof that Carter's statement motivated Maddox's action.

■ Moreover, even if plaintiff had made out a *prima facie* case by presenting evidence of a causal connection between Carter's statement and Johnson's being fired, all that would do would be to shift to

the defendant the burden of providing reasons for its action. The burden would then shift back to plaintiff to establish that the reasons were a pretext for retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The defendant certainly came forward with reasons for Johnson's termination, i.e.,the disorganization of his initial draft on halfway houses and the need for substantial editing of it, his behavior during the service of the *subpoena duces tecum*, what his employers thought was his mistaken approach to the information given Bramson in the anonymous phone call concerning the safety hazards at the Blue Plains plant, and his disorganized oral briefings on the matters assigned to him. Against that, Johnson offered the favorable evaluations of his work by Marsilio, his insistence that his superiors never directly criticized his work, and his perception that he was set up to fail because he had been given such short notice of his obligation to brief his superiors on the Blue Plains investigation. As to Blue Plains, he insisted that he properly understood his responsibility to be the investigation of contract fraud only and not the safety issues.

When one looks at the evidence as objectively as possible, all one can say is that there were two schools of thought about Johnson. The first, consisting of Andersen, Bramson and, ultimately, Maddox, believed that he could not do the job; indeed, Andersen wondered why he was hired in the first place. Bowie and Miller, who knew Johnson well, were willing to give him more time to improve his work to meet Maddox's criticism of it, but refused to guarantee Maddox that this improvement would occur. The evidence, therefore, indicates at most a legitimate dispute among reasonable people as to whether Johnson should stay or go. The legitimacy of that dispute makes it impossible for the finder of fact to conclude that the reasons for terminating Johnson were merely a pretext for retaliation against him. My verdict therefore must be for the defendant.

An Order, entering final judgment, accompanies these Findings of Fact and Conclusions of Law.

## FINAL JUDGMENT

This action came on for trial before the Court, the Honorable John M. Facciola, presiding, and the issues having been duly tried, and a decision having been finally rendered,

**IT IS ORDERED AND ADJUDGED THAT** plaintiff take nothing, that the action be dismissed on its merits and that the defendant recover of plaintiff the costs of action.