# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 6, 2010          Decided June 21, 2011

No. 08-5111

DAVID M. BOWIE,
APPELLANT

v.

CHARLES C. MADDOX, INSPECTOR GENERAL, IN HIS OFFICIAL
AND INDIVIDUAL CAPACITIES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:03-cv-00948)

———

*James C. Cox*, appointed by the court, argued the cause for appellant. With him on the briefs were *David W. DeBruin* and *Jessie K. Liu*, appointed by the court.

*David M. Bowie*, pro se, filed briefs for appellant.

*David A. Hyden*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Peter J. Nickles*,

Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

*R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, BROWN, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Appellant David M. Bowie, a former official of the District of Columbia Office of the Inspector General ("OIG"), was fired after five years on the job, purportedly for poor performance. Bowie brought this suit against the District and officers of the OIG ("Defendants") after he was fired, alleging that they conspired to deter his testimony in a subordinate's employment discrimination trial and ultimately fired him in retaliation for his refusal to help sabotage his fellow employee. The district court entered judgment in favor of Defendants on Bowie's § 1985(2) conspiracy claim, a related claim under § 1986 for failure to prevent the conspiracy, and his First Amendment retaliation claim. After a trial on Bowie's Title VII retaliation claim, the jury found in favor of Defendants. We vacate the dismissal of Bowie's §§ 1985(2) and 1986 conspiracy claims, because the district court erroneously required an invidious, class-based motive for the alleged conspiracy and because the district court concluded, without support, that Title VII was the exclusive remedy for this type of retaliation. *McCord v. Bailey*, 636 F.2d 606, 614 (D.C. Cir. 1980). We affirm in all other respects.

I

Bowie was the Assistant Inspector General of the Investigations Division at the OIG from November 1997 until his termination in August 2002. Defendants say Bowie was fired for performance problems. But Bowie says his termination was the culmination of a retaliatory conspiracy by his superiors to punish him for supporting Emanuel Johnson, a subordinate whom the OIG fired over Bowie's dissent.

Bowie's professional relationship with Johnson dated back to the years they overlapped at the Federal Bureau of Investigation ("FBI"). (Bowie had worked for the FBI for twenty-four years before he joined the OIG.) Back in 1993, Bowie and Johnson had initiated a class action against the FBI, alleging a discriminatory failure to promote black agents. Bowie claims that in 1999, after Johnson followed him from the FBI to OIG's Investigations Division, Bowie's boss, Inspector General Charles C. Maddox, told Bowie that FBI Assistant Director Jimmy C. Carter had threatened not to "provide any assistance or cooperation with the [OIG] in investigative matters" if Johnson was involved. Bowie interpreted this as "a direct demand that Maddox fire Johnson" or "suffer a severed FBI/[OIG] relationship." Bowie suspects Carter's ultimatum was motivated by his anger at Johnson for filing several discrimination complaints—some against Carter himself—with the FBI's Equal Employment Office.

Maddox met with OIG supervisors, including Bowie, on February 7, 2000, to discuss Johnson's future with the office. Bowie says he warned Maddox that firing Johnson would violate office policy and federal law, and he recommended putting Johnson on a sixty-day Performance Improvement Plan ("PIP") instead. After the meeting, Maddox ordered Bowie to

give Johnson notice that he could either resign or be fired. Bowie did so two days later on February 9, 2000, and Johnson was terminated effective March 1, 2000. *See Johnson v. Maddox*, 270 F. Supp. 2d 38, 43 (D.D.C. 2003), *aff'd* 117 F. App'x 769 (D.C. Cir. 2004).

Johnson filed a discrimination charge against OIG with the Equal Employment Opportunity Commission ("EEOC") on March 28, 2000. Deputy Attorney General Gail Davis, who was representing the District before the EEOC, drafted an affidavit for Bowie to sign that detailed Johnson's "failure to perform his duties in a satisfactory manner" in three investigations. OIG General Counsel Karen Branson sent the draft to Bowie with instructions to sign it that day. Bowie refused, citing "misstatements of fact" and "language that would convey impressions that [he] would not agree with." Branson then asked Bowie to submit an affidavit in his own words by the following day. Bowie's substantially revised affidavit still noted problems with one investigative report Johnson had drafted and related his "sense that Mr. Johnson clearly did not yet understand the mechanics of how things are done in [the OIG] compared to his former employer." But Bowie also opined that the harshest criticism leveled at Johnson was inconsonant with the views of Johnson's immediate supervisors, who had praised him as a "model investigator." Bowie's affidavit repeated his view that putting Johnson on a PIP would have been a better course of action than firing him. Bowie submitted his affidavit to Branson, but Davis decided not to file it with the OIG's position statement before the EEOC because "it included too much information that was not relevant to the issue at hand," and which Bowie was unwilling to eliminate.

Bowie claims Defendants started setting him up for termination after he expressed support for Johnson. Bowie had

received top-notch performance reviews for his first three years at the OIG, but his standing in the office took a turn for the worse in 2000. Bowie says that on February 11, 2000, days after he objected to the plan to fire Johnson, Bowie's superiors accused him of "not stepping up to the plate." In February 2001—about three months after Johnson filed a Title VII complaint in district court—Maddox removed Bowie from a high-profile investigation. In December 2001, Maddox elevated a former subordinate, Jerome Campane, to a newly created position, Deputy Inspector General for Investigations, one step above Bowie. Around this same time, Bowie's performance rating began to fall. In October 2001, his rating dropped from 4.9 to 4.1 on a five-point scale; that is, from "significantly exceeds expectations" to "exceeds expectations."

In May 2002—within a month after Bowie's name appeared on Johnson's witness list—a mid-year performance evaluation criticized Bowie's management, the quality and quantity of his office's Reports of Investigation ("ROIs"), and his overprotectiveness toward his subordinates. Defendants point out that a prior report, issued in December 1999 by the Inspections and Evaluations Division, had forecast some of these problems. According to the 2002 mid-year evaluation, Bowie had failed to remedy faults identified in an individual performance plan created for him sometime in 2001. Soon after the mid-year performance evaluation issued, Maddox ordered the Inspections and Evaluations Division to reassess the Investigations Division because it had failed to begin internal preparations for a statutorily mandated peer review. Al Wright, the Assistant Inspector General for the Inspections and Evaluations Division had recommended the reinspection, suggesting it would provide "a roadmap of options . . . to make changes and lay the groundwork for [Campane's] new management team." Wright issued the reinspection report on

July 26, 2002, and it repeated the mid-year evaluation's criticism of Bowie. Bowie was fired less than three weeks later, on August 16, 2002.

Bowie filed suit in April 2003 against the District and OIG officials in their official and individual capacities.[1] Relevant to this appeal, Bowie alleged a conspiracy to deter him from testifying in support of Johnson under 42 U.S.C. §§ 1985(2) and 1986 (failure to prevent the conspiracy), infringement of his First Amendment freedom of speech under 42 U.S.C. § 1983, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*

The district court dismissed Bowie's conspiracy and First Amendment claims, and his retaliation claims proceeded to trial. The jury returned a verdict for Defendants, and the district court denied Bowie's motions for judgment as a matter of law and for a new trial. Bowie timely appealed.

II

A

Bowie alleges Defendants "knowingly and willfully conspire[d]" to "obstruct[] [his] testimony before a Federal Court" in violation of 42 U.S.C. § 1985(2) and failed to prevent that conspiracy in violation of § 1986. The first clause of § 1985(2) permits an action for damages when

---

[1] Bowie's complaint also named Attorney General John Ashcroft, former FBI Assistant Director Jimmy C. Carter, and Mayor Anthony Williams. Bowie voluntarily dismissed the federal defendants, Dist. Ct. Docket No. 22, and the district court granted an unopposed motion to dismiss the mayor. Dist. Ct. Docket No. 32.

two or more persons in any State or Territory[2] conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified.

42 U.S.C. § 1985(2). The next section of the Civil Rights Act permits recovery against any "person who, having knowledge that any of the wrongs conspired to be done, and mentioned in [§ 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do." *Id.* § 1986. Recovery under § 1986 depends on the existence of a conspiracy under § 1985.

The district court dismissed Bowie's conspiracy claims in a one-page order with a cryptic reference to the previous day's court proceedings: "Upon review of plaintiff's Amended Complaint and after discussion with counsel for the parties at the pretrial conference, it is obvious to the Court that there are no facts alleged that could sustain plaintiff's claim under 42 U.S.C. § 1985." Dist. Ct. Docket No. 113. At the pretrial conference mentioned in the order, the district court had articulated two possible grounds for dismissal, but each is based on a misunderstanding of the nature of Bowie's conspiracy claims.

---

[2] The phrase "State or Territory" in this provision embraces the District of Columbia. *See Georgetown Univ. Hosp. v. Sullivan*, 934 F.2d 1280, 1285 (D.C. Cir. 1991) (citing *McCord v. Bailey*, 636 F.2d 606, 617 n.15 (D.C. Cir. 1980)).

8

1

Our review of the transcript from the pretrial conference suggests the district court's dismissal of Bowie's § 1985 claim relied first and foremost on his failure to produce evidence of class-based animus. Addressing that claim, the district court said, "[i]t can't be a race question if Wright is also black." Tr. of Pretrial Conference (May 10, 2007), at 9, *reprinted at* Joint Appendix ("J.A.") 481; *see id.* at 10 ("If Wright is also black, then I don't get what the 1985 claim could be."). But Bowie's claim of a conspiracy to deter his testimony does not require evidence of race discrimination. Lack of invidious motive is an inadequate basis for dismissing a claim under the first clause of § 1985(2), because that clause "contain[s] no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws." *Kush v. Rutledge*, 460 U.S. 719, 725 (1983).[3] Therefore, to the extent the district court based its dismissal of Bowie's § 1985(2) claim on the fact that

---

[3] The Supreme Court explained that

> the sponsors of the 1871 bill added the 'equal protection' language [in the second clause of § 1985(2) and the first two clauses of § 1985(3)] in response to objections that the 'enormous sweep of the original language' vastly extended federal authority and displaced state control over private conduct. That legislative background does not apply to the portions of the statute [like the first clause of § 1985(2)] that prohibit interference with federal officers, federal courts, or federal elections.

*Kush*, 460 U.S. at 726. As in *Kush*, "the statutory language that provides the textual basis for the 'class-based, invidiously discriminatory animus' requirement simply does not appear in the portion of the statute that applies to this case." *Id.*

defendants were of the same race and gender as Bowie, the court erred.

2

At the same pretrial conference, the district court also suggested Bowie's § 1985 claim was foreclosed because it "would be covered by Title [VII]." J.A. 482. The court reasoned that as an at-will employee, Bowie had no right to continued employment, and therefore "the only right he has here would be to not be retaliated against[,] which is covered by Title [VII]." *Id.* 483. This rationale is based on another misconception about Bowie's § 1985 claim—namely, that it is coterminous with Bowie's Title VII claim of retaliatory termination for supporting Johnson. *Cf. Ethnic Emps. of the Library of Cong. v. Boorstin*, 751 F.2d 1405, 1414–15 (D.C. Cir. 1985) ("[T]he district court properly dismissed those constitutional claims that simply restated claims of racial, ethnic or other discrimination cognizable under Title VII, or claims of retaliation for the invocation of Title VII rights."). But Bowie's § 1985(2) claim specifically alleged a conspiracy to deter him from testifying in support of Johnson in federal court. The corresponding right is created by § 1985(2), not Title VII. *See Irizarry v. Quiros*, 722 F.2d 869, 872 (1st Cir. 1983); *cf. Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979) ("[D]eprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3).").

Defendants have not attempted to explain how Title VII preempts such a claim, and our research suggests it does not. *See Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 703 (2d Cir. 1972) ("Our investigation of . . . Title VII . . . has failed to reveal any provision that might conceivably cover appellant's . . . allegation of infringement of his right of access to the courts

[which] is suggestive of an action based upon 42 U.S.C. § 1985(2) . . . ."). The dismissal of Bowie's conspiracy claim under clause one of § 1985(2) cannot be sustained on the district court's unsupported belief that "Title [VII] is [the] exclusive remedy for that type of retaliation." J.A. 482.

3

Although the district court's statements at the pretrial conference were limited to the two theories we have just rejected, Defendants rely on a third theory to defend the dismissal of Bowie's conspiracy claim. Defendants argue they could not have engaged in a conspiracy because they are all employees of the same District agency, and a single corporate entity cannot conspire with itself. The intracorporate conspiracy doctrine, as it is called, originated in the antitrust context, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984), and its application to civil rights conspiracies is an open question in this circuit.[4]

At least seven circuits have held the intracorporate conspiracy doctrine applies to civil rights conspiracies. *See Grider v. City of Auburn*, 618 F.3d 1240, 1261–62 (11th Cir. 2010); *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008); *Amadasu v. Christ Hosp.*, 514 F.3d 504, 507 (6th Cir. 2008); *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998), *cert. denied*, 526 U.S. 1065 (1999); *Hartman v. Bd. of*

---

[4] Amicus curiae, arguing on behalf of Bowie, points to one case in which we affirmed a damages award under § 1985(3), even though one of the relevant conspiracies involved only FBI agents. *See Hobson v. Wilson*, 737 F.2d 1, 13 (D.C. Cir. 1984). But we did not mention the intracorporate conspiracy doctrine in that case. We have yet to pick sides in the circuit split regarding the doctrine's applicability to civil rights cases in general and the first clause of § 1985(2) in particular.

*Trustees of Cmty. Coll. Dist. No. 508*, 4 F.3d 465, 469–71 (7th Cir. 1993); *Richmond v. Bd. of Regents of Univ. of Minnesota*, 957 F.2d 595, 598 (8th Cir. 1992); *Buschi v. Kirven*, 775 F.2d 1240, 1252–53 (4th Cir. 1985). *But see Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir. 1981) (questioning the doctrine in dicta). Of those, four courts have applied the doctrine to bar the specific cause of action at issue here—a claim brought under the first clause of § 1985(2) for conspiracy to deter attendance at or testimony in a federal court. *Meyers v. Starke*, 420 F.3d 738, 742 (8th Cir. 2005); *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1507–09 (7th Cir. 1994); *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 339–40 (6th Cir. 1984); *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978). But another court has explicitly excepted such claims from the doctrine's reach. *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1035–41 (11th Cir. 2000). And some of the same courts that apply the intracorporate conspiracy doctrine in the civil rights context have recognized other exceptions that Bowie argues would allow his § 1985(2) claim to proceed. In some jurisdictions, for example, the doctrine does not apply where the civil rights conspiracy consists of "a series of discriminatory acts," *Volk v. Coler*, 845 F.2d 1422, 1435 (7th Cir. 1988); *cf. Baker v. Stuart Broad. Co.*, 505 F.2d 181, 183 (8th Cir. 1974) (applying the doctrine where "the challenged conduct is essentially a single act of discrimination by a single business entity"); *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972) (same), or where the corporate agents' actions were either unauthorized or motivated by "an independent personal stake in achieving the corporation's illegal objective," *Buschi*, 775 F.2d at 1252; *see Benningfield*, 157 F.3d at 378 (noting a "possible exception . . . where corporate employees act for their own personal purposes").

In contrast with the majority rule, two circuits have held the intracorporate conspiracy doctrine does not preclude liability for a civil rights conspiracy by the individual officers and employees of a single corporate entity. *See Brever v. Rickwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1256–59 & n.121 (3d Cir. 1978) (en banc), *vacated on other grounds*, 442 U.S. 366 (1979); *cf. Robison v. Canterbury Vill., Inc.*, 848 F.2d 424, 430–31 (3d Cir. 1988) (applying the doctrine to affirm the dismissal of a § 1985(3) claim against a corporation and its president "in his corporate capacity"). A third court declined to apply the doctrine on the narrower ground that the conspiracy "went beyond 'a single act' of discrimination," but expressed skepticism about the doctrine's place in any civil rights case. *Stathos v. Bowden*, 728 F.2d 15, 20–21 (1st Cir. 1984) (Breyer, J.). *But see Rice v. President & Fellows of Harvard Coll.*, 663 F.2d 336, 338 (1st Cir. 1981) (affirming the dismissal of a claim against "the President and Fellows of Harvard College, which is a single corporate entity and, therefore, unable to conspire with itself in violation of § 1985(3)").

Finally, the Ninth Circuit has managed to avoid deciding whether the intracorporate conspiracy doctrine applies in the civil rights context, *see Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1181 (9th Cir. 1998), but has declined to extend the doctrine to criminal cases, *see United States v. Hughes Aircraft Co.*, 20 F.3d 974, 979 (9th Cir. 1994).

The parties and amicus curiae tacitly agree the intracorporate conspiracy doctrine was the controlling rationale for the district court's decision, but the record does not support that assumption. The court's order itself is devoid of explanation; although Defendants consistently argued there could be no conspiracy under § 1985 where all of them worked

for the same agency, the pretrial conference transcript gives us no reason to believe the district court was persuaded by that argument. The court's only reference to the intracorporate conspiracy doctrine occurred in a prior order dismissing Bowie's § 1985 claim on that ground. Dist. Ct. Docket No. 57, at 10 ("Since all of the people in the alleged conspiracy were acting within the scope of their employment for the District of Columbia, they could not have legally conspired because of the intracorporate conspiracy doctrine."). But the district court subsequently reversed itself, reinstating Bowie's § 1985 claim against District officials only and thereby implicitly rejecting the intracorporate conspiracy doctrine. Dist. Ct. Docket No. 82, at 8. Defendants have pointed to nothing, other than their own arguments before the district court, to indicate the court dismissed Bowie's conspiracy claim on that ground a second time.

Mindful of "the general rule . . . that a federal appellate court does not consider an issue not passed upon below," *Singleton v. Wulff*, 428 U.S. 106, 120 (1976), we decline to decide the validity of Defendants' intracorporate conspiracy defense in the absence of a relevant decision by the district court. We may, of course, affirm the district court's dismissal "for any reason properly raised by the parties." *Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008). But Defendants' invocation of the intracorporate conspiracy doctrine raises several questions of first impression in this circuit that would benefit from the trial court's consideration—whether the doctrine applies at all in the civil rights context; whether in particular it makes sense to attribute the acts of an agency's employees to the agency itself when what is alleged is a conspiracy to deter testimony in federal court; and whether any other relevant exception applies. In appropriate circumstances, we may consider a novel legal question in the

first instance without the benefit of the district court's initial view. *See Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 388 F.3d 337, 345 (D.C. Cir. 2004); *Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.*, 659 F.2d 168, 179 (D.C. Cir. 1981). But "this court's 'normal rule' is to avoid such consideration." *Liberty Prop. Trust v. Republic Props. Corp.*, 577 F.3d 335, 341 (D.C. Cir. 2009) (quoting *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1085 (D.C. Cir. 1984)). Because the district court suggested no viable rationale for its order, we vacate the dismissal of Bowie's conspiracy claims under §§ 1985(2) and 1986.

4

Bowie sought to thwart the intracorporate conspiracy defense by adding federal officers and lawyers from the District's Office of the Attorney General to his roster of OIG defendants, but the district court rebuffed that effort as futile. We affirm the district court's denial of Bowie's motion to reinstate Jimmy Carter and to add Gail Davis and Teresa Quon as defendants. According to Bowie's proposed amendments to his complaint, the adverse employment actions designed to control or silence Bowie's testimony pertain only to the OIG Defendants, not Carter. Dist. Ct. Docket No. 45-2, at 22–45. Carter's alleged participation in, and knowledge about, the purported conspiracy ended with Johnson's termination, *i.e.*, before any conspiracy relating to Bowie's testimony is alleged to have started. *Id.* at 14–22. "[T]here are two substantive limitations on a defendant's responsibility for acts undertaken by co-conspirators: Those acts must be 'in furtherance of' the same conspiracy to which the defendant has agreed, and they must be reasonably foreseeable to the defendant." *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995); *see also United States v. Saro*, 24 F.3d 283, 288 (D.C. Cir. 1994) ("The extent

of a defendant's vicarious liability under conspiracy law is always determined by the scope of his agreement with his co-conspirators. Mere foreseeability is not enough."). Because Bowie does not allege Carter was privy to any conspiracy to deter Bowie's testimony, Carter could not have been held liable under § 1985(2).

As for Davis and Quon, Bowie alleges, at best, that they interfered with his attempt to offer testimony before the EEOC. Dist. Ct. Docket No. 45-2, at 28, 50–51. But § 1985(2) creates a cause of action against one who deters the plaintiff from attending or testifying in "any court of the United States." 42 U.S.C. § 1985(2). We have never interpreted that phrase to include an administrative agency like the EEOC, and other courts have explicitly foreclosed such a broad reading of the statute. *See Seeley v. Bhd. of Painters*, *Decorators and Paper Hangers of Am.*, 308 F.2d 52, 58 (5th Cir. 1962); *Graves v. United States*, 961 F. Supp. 314, 319 (D.D.C. 1997); *see also McAndrew*, 206 F.3d at 1039–40 & n.10 (contrasting § 1985(2) with the broader scope of 18 U.S.C. § 1512(b), which criminalizes interference with testimony "in any official proceeding," including one before a federal agency).

Finally, Bowie does not state a claim under § 1986 as to Carter, Davis, or Quon, as he alleges neither that they had knowledge of the alleged conspiratorial acts against Bowie, nor that they would have had the power to prevent them. *See* 42 U.S.C. § 1986. Because adding these defendants to Bowie's complaint would have been futile, the district court did not abuse its discretion in denying his motion for leave to amend. *See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004).[5]

---

[5] We also affirm the denial of leave to amend as to Quon on the alternative ground that Bowie waived this argument in the district

B

Bowie appeals the district court's grant of summary judgment for Defendants on the First Amendment retaliation claim he brought under 42 U.S.C. § 1983. Bowie claims he was terminated in retaliation for refusing to sign the affidavit drafted for him in response to Johnson's EEOC charge and for drafting his own affidavit which implicitly criticized Maddox's decision to terminate Johnson.

> It is true that individuals do not "relinquish the First Amendment rights they would otherwise enjoy as citizens" when they accept employment with the government. . . . However, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."

*Navab-Safavi v. Glassman*, 2011 U.S. App. LEXIS 3868, 8–9 (D.C. Cir. Mar. 1, 2011) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). To balance these competing interests in First Amendment retaliation claims by government employees, we apply a four-factor test:

> First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's

---

court. *See* Dist. Ct. Docket No. 64-1, at 10–11 ("Plaintiff agrees that Teresa Quon should be dismissed as a defendant to this litigation as her role differs substantially from that of Gail Davis.").

> interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that [his] speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

*Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007) (quotation marks, citations, and alterations omitted).

The district court dismissed Bowie's First Amendment claim on the first of these prongs, holding that "[s]peech regarding 'individual personnel disputes and grievances' is not relevant to the public's evaluation of governmental agencies' performance." *Bowie v. Gonzales*, 433 F. Supp. 2d 24, 33 (D.D.C. 2006) (quoting *Murray v. Gardner*, 741 F.2d 434, 438 (D.C. Cir. 1984)). Bowie points out that we have since "reject[ed] the proposition that a personnel matter per se cannot be a matter of public concern." *LeFande v. District of Columbia*, 613 F.3d 1155, 1161 (D.C. Cir. 2010). He argues that his speech was on a matter of public concern because he composed his affidavit for the purpose of submitting it to the EEOC. *See Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir. 1989) ("When an employee testifies before an official government adjudicatory or fact-finding body[,] he speaks in a context that is inherently of public concern.").

We need not decide whether an affidavit prepared for an EEOC proceeding is necessarily speech on a matter of public concern, because Bowie's claim fails for another reason. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not

insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Even if the draft affidavit and Bowie's revision of it were "on a matter of public concern," *Wilburn*, 480 F.3d at 1149, he was not speaking "as a citizen," *id.*, when he refused to sign the former or when he composed the latter. In both instances, Bowie was acting "pursuant to [his] official duties" as an employee of OIG. *Garcetti*, 547 U.S. at 421.

Bowie's efforts to produce an affidavit were undertaken at the direction of his employer and in his capacity as Assistant Inspector General for Investigations and Johnson's superior. The first version of the affidavit was drafted for OIG's convenience by a Deputy Attorney General as counsel for OIG, and it was given to Bowie for his signature by the OIG's general counsel. Bowie revised the affidavit on a timetable approved by the general counsel, and then submitted it to her for submission with the OIG's position statement in the EEOC. Bowie does not allege Defendants stymied any personal effort to submit his affidavit to the EEOC or to Johnson directly. Indeed, Bowie made no such effort. His affidavit, like the draft he refused to sign, identified him in the first paragraph and signature block as "Assistant Inspector General for Investigations." All the speech underlying Bowie's First Amendment claim occurred in his official capacity. Government employers, like their private-sector counterparts, necessarily exert control over their employees' speech in the course of operating an agency. "[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Wilburn*, 480 F.3d at 1150 (quoting *Garcetti*, 547 U.S. at 424). We therefore affirm the district court's grant of summary judgment on Bowie's First Amendment claim.

19

C

Finally, Bowie attacks the jury verdict on his Title VII and D.C. Human Rights Act claims by appealing the district court's evidentiary decisions. "[W]e review a trial court's evidentiary rulings for abuse of discretion and even if we find error, we will not reverse an otherwise valid judgment unless appellant demonstrates that such error affected [his] substantial rights." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 911 (D.C. Cir. 2010) (alterations and quotation marks omitted) (quoting *Whitbeck v. Vital Signs, Inc.*, 159 F.3d 1369, 1372 (D.C. Cir. 1998)). We find no abuse of discretion in the evidentiary rulings Bowie challenges.

1

The district court did not abuse its discretion in excluding testimony from Alfred Miller, a Deputy Assistant Inspector General in the Investigations Division. Miller was allowed to testify about the number of ROIs the Investigations Division produced during Bowie's tenure. But when Defendants objected to Miller's testimony about ROI production volume after Bowie's termination, the district court sustained the objection on relevance grounds. Bowie argues the post-termination statistics were relevant because they would have revealed as pretext one of the stated reasons for Bowie's termination—his purportedly inadequate ROI production.

The relevance of post-termination evidence in a Title VII case depends on the nature of the evidence, the purpose for which it is offered, and the context in which it arises. In some circumstances, post-termination data is relevant to the employer's state of mind before termination. *See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 561 (10th Cir. 1996)

(permitting plaintiff to introduce evidence that other employees in the protected age class were replaced, because "evidence concerning the make-up of the employment force and events which occurred after plaintiff's termination were entirely relevant to the question of whether or not age was one of the determinative reasons for plaintiff's termination"), *cited in Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1080 (D.C. Cir. 1999). In other circumstances, post-termination data is irrelevant to pre-termination events and motives. *See Warren v. Prejean*, 301 F.3d 893, 905 (8th Cir. 2002) (affirming the exclusion of testimony about information that was not previously available to the employer and was therefore "irrelevant as to the information known to [the employer] at the time of the termination"). This is an inquiry best suited to the district court, and our review is appropriately deferential.

Although, sitting as a trial court, we may have allowed Miller to testify, we cannot say the district court's decision to exclude testimony about ROI production following Bowie's termination was an abuse of discretion. Defendants could not possibly have known for certain how ROI production would change after Bowie left the OIG. At the time they made the decision to fire Bowie, the only available ROI data was the data from his own tenure. Under Bowie, the Investigations Division issued 22 reports in 1998, 26 in 1999, 87 in 2000, 46 in 2001, and 25 in 2002. Bowie was allowed to, and did, try to explain the reasons for the sharp decline between 2000 and 2002. Evidence that even fewer ROIs were issued by the succeeding Assistant Inspector General, without more, would not have been probative of Defendants' state of mind when they fired Bowie. The district court did not abuse its discretion in deciding the specific post-termination evidence in this case was irrelevant to the purpose for which it was admitted—proving pretext. *See, e.g.*, *Green v. City of St. Louis*, 507 F.3d 662, 669 (8th Cir.

2007) ("The district court did not purport to state a rule that post-termination statements are never relevant to state of mind at the time of termination; instead, the court assessed the evidence as presented to it and concluded that the statements here were only relevant to later events. There was no abuse of discretion.").

2

At Defendants' request, and over Bowie's objection, the district court informed the jury that Johnson had lost his Title VII case. *See Johnson*, 270 F. Supp. 2d 38. Under Rule 403 of the Federal Rules of Evidence, the district court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. "We review the district court's Rule 403 determinations with great deference, reversing only for grave abuse of discretion." *Stevenson v. D.C. Metro. Police Dep't*, 248 F.3d 1187, 1191 (D.C. Cir. 2001).

Amicus argues that the outcome of Johnson's case was irrelevant to whether Defendants retaliated against Bowie for supporting Johnson and that its admission risked confusing the issues and prejudicing Bowie because the jury might have equated the merits of his Title VII case with Johnson's failed claim.[6] Defendants respond that taking judicial notice of the

---

[6] We have no qualms about addressing an argument raised by court-appointed amicus curiae and not by the pro se party on whose behalf he was appointed to present arguments. It is precisely because an untrained pro se party may be unable to identify and articulate the potentially meritorious arguments in his case that we sometimes exercise our discretion to appoint amici. *See* D.C. Cir. Rule 29 ("The rules stated below apply with respect to the brief for an amicus curiae

judgment in Johnson's case "decrease[d] the chance that the jury would improperly speculate on the outcome and the merits of Johnson's (and Bowie's) complaints," Appellees' Br. 21, and that Bowie could have offered a jury instruction to limit any prejudicial side effects. We acknowledge the risks inherent in informing the jury about the outcome of the very case Bowie claims he was fired for supporting. *Cf. Johnson v. Colt Indus. Operating Corp.*, 797 F.2d 1530, 1534 (10th Cir. 1986) ("[T]he admission of a judicial opinion as substantive evidence presents obvious dangers. The most significant possible problem posed by the admission of a judicial opinion is that the jury might be confused as to the proper weight to give such evidence. It is possible that a jury might be confused into believing that the opinion's findings are somehow binding in the case at bar."). But we cannot conclude any prejudice Bowie may have suffered was the fault of the district court. The court invited Bowie to submit a limiting instruction, and Bowie failed to do so. Under these circumstances, we conclude the district court did not abuse its discretion. *See United States v. Edwards*, 388 F.3d 896, 902–03 (D.C. Cir. 2004).

3

In discovery, Bowie requested all Investigative Reports in Defendants' possession, including drafts that Defendants contemplated using "to show 'poor work performance' by Plaintiff." Bowie moved to compel, complaining Defendants had disclosed cover sheets without the corresponding "reports,

---

not appointed by the court. A brief for an amicus curiae appointed by the court is governed by the provisions of Circuit Rule 28 [pertaining to briefs for appellants, *inter alia*]."); *cf. Edison Elec. Inst. v. OSHA*, 849 F.2d 611, 625 (D.C. Cir. 1988) (citing the predecessor to Rule 29 in declining to address an issue raised exclusively by a non-court-appointed amicus).

drafts, [and] tracking sheet[s] to show where the report was at a given time." The court denied the motion to compel in relevant part, pointing out that the relevant disclosure request had asked for only those reports and drafts that Defendants contemplated using—it had not mentioned tracking documents. "We review district court rulings on discovery matters solely for abuse of discretion," reversing only if the party challenging the decision can show it was "clearly unreasonable, arbitrary, or fanciful." *Charter Oil Co. v. Am. Emp'rs' Ins. Co.*, 69 F.3d 1160, 1171 (D.C. Cir. 1995). We find no such abuse of discretion in the district court's partial denial of Bowie's motion to compel. On appeal, Bowie points to a letter he wrote to Defendants' counsel in which he complained of Defendants' failure to produce "routing slips" pertinent to a different disclosure request. We assume, for the sake of argument, that "routing slip" and "tracking document" are synonyms. But Bowie's motion to compel, which lists eight other disclosure requests by number and describes them in detail, does not mention that one.

Finally, Bowie points to no specific document that Defendants used against him in court yet failed to disclose in advance. Since the relevant disclosure request specified only documents that Defendants contemplated using to prove his poor work performance, Bowie's argument that Defendants failed to supplement their disclosure is without merit. *See* Fed. R. Civ. P. 26(e).

III

For the foregoing reasons, we vacate the district court's order dismissing Bowie's conspiracy claims under 42 U.S.C.

§§ 1985(2) and 1986 and remand for further proceedings consistent with this opinion. We affirm in all other respects.[7]

*So ordered.*

---

[7] Bowie asks us to reinstate his wrongful termination claim under 42 U.S.C. §§ 1981 and 1983 and D.C. law, and his D.C. Whistleblower Protection Act claim, but neither his brief nor the brief submitted on his behalf by court-appointed amicus curiae attempts a legal argument in support of those claims. We need not address claims that are barely mentioned in a party's brief. *See United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 879 (D.C. Cir. 2010) ("A litigant does not properly raise an issue by addressing it in a cursory fashion with only bare-bones arguments." (quoting *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001))).