UNITED STATES of America, Appellee,

v.

Trevor I. BURNETT, Appellant.

No. 89–3031.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1989.

Decided Dec. 8, 1989.

---

William S. Rhyne, Washington, D.C., (appointed by this Court), for appellant.

Steven W. Pelak, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, and SENTELLE, Circuit Judge, and OBERDORFER,* District Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Appellant Trevor Burnett challenges his conviction of possession with intent to distribute cocaine, 21 U.S.C. §§ 841(a), (b)(1)(A)(iii), on three grounds: (1) that the district court erred in failing to suppress evidence obtained through a search that Burnett claims violated his legitimate expectation of privacy; (2) that the trial judge improperly sustained objections to questions asked by Burnett's counsel of one of Burnett's co-defendants at the suppression hearing; and (3) that the prosecution's closing statement involved an improper missing witness argument that ultimately denied Burnett a fair trial. We dismiss all of appellant's claims and affirm his conviction.

---

* The Honorable Louis F. Oberdorfer, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

## I. Factual Background

On July 26, 1988, a grand jury indicted appellant Trevor Burnett, along with Anthony Cameron, Frank Parris, and Jacqueline Hall, of unlawful possession with intent to distribute 50 grams or more of a mixture containing cocaine base, 21 U.S.C. §§ 841(a), (b)(1)(A)(iii) (1982), unlawful use of a firearm in aid of drug trafficking, 18 U.S.C. § 924(c)(1) (1982), and aiding and abetting an offense against the United States, 18 U.S.C. § 2 (1982). The indictments stemmed from the following events.

According to the government, on June 29, 1988, around 4:30 a.m., three officers of the Metropolitan Police Department ("MPD") were investigating drug activity in a northeast Washington housing project. Acting on a tip, the officers went to apartment no. 23, where they knocked on the door and identified themselves. Anthony Cameron, who had seen the officers from the second story landing and then returned to the apartment, opened the door. At their request, Cameron allowed the officers into the apartment's living room. When one of the officers, Detective Lorren Leadmon, asked Cameron whether he knew the whereabouts of the "lady of the house"—the apartment's lessee—and whether he lived in the apartment, Cameron answered negatively. Leadmon then asked Cameron whether anyone else was in the apartment. While posing the question, Leadmon saw an arm stretched across a bed through the outer door of a bedroom just off the living room of the apartment. Cameron, however, simultaneously said that there was no one else in the apartment.

The officers then stepped into the hallway from the living room and introduced themselves as police to appellant Burnett, whose arm they had seen through the open door. Without entering the bedroom, the officers asked Burnett whether he lived in the apartment and whether he knew the lessee's whereabouts. Appellant answered the officers' questions in the negative, but added that he knew the lessee as "Wanda." While speaking to Burnett, the officers noticed an open second bedroom to their right, and a man and a woman—Frank Parris and Jacqueline Hall—inside. Like appellant, Parris and Hall were fully clothed and lying on a bed with their heads at the foot of the bed towards the open bedroom door. Leadmon asked them the same questions about the whereabouts of the lessee as he had asked Cameron and Burnett, and received the same answers.

While the officers were speaking with Parris and Hall, they noticed an unzipped tote bag just inside the second bedroom, about three or four feet from where they were standing in the hallway. Inside the tote bag the officers saw bundles of money as well as a plastic bag containing a white powder that they suspected to be crack cocaine. A subsequent inventory revealed that the tote bag contained 101 smaller bags containing cocaine as well as identification in Burnett's name. Engaging in a protective search, the officers found a shotgun underneath one of the beds in the bedroom where Hall and Parris had been. On the advice of an Assistant United States Attorney, the officers seized the tote bag, with the money and the drugs that they saw, as incriminating evidence in their plain view.[1] The officers then obtained a search warrant encompassing the entire apartment, where they found more cash, cocaine, and drug paraphernalia.[2]

Burnett's co-defendant Cameron presented a somewhat different version of these events. He testified at the suppression hearing that he had been asleep on the living room couch when the officers

---

**1.** Precisely what evidence the officers seized is unclear. At a hearing on the defendants' suppression motions, Detective Leadmon stated: "The United States Attorney advised to seize only the objects that we had observed in plain view. That would be the bag, with the money and the drugs that we could see, and the shotgun that was under the bed...." Transcript of Motions Hearing ("Mot. Tr.") at 30 (Oct. 17, 1988). At trial, Leadmon testified: "The United States Attorney instructed us to seize the items that we saw in plain view and nothing further. So, we seized the bag with the money that was in it and the drugs...." Transcript of Trial ("Tr.") at I-19-20 (Dec. 12, 1988).

**2.** The precise location of this additional evidence is unclear from the record.

knocked on the apartment door. He let the officers into the apartment only after they repeatedly told him to "Step aside." In addition, he claimed that the door to the bedroom where Hall, Parris, and the tote bag were found was closed. Ronald Jackson, who lived across the hall from Burgess' apartment, testified that he saw one police officer put his foot in the apartment door as he tried to enter.

Cameron also testified that he had arrived on the night of June 28 at Burgess' apartment, where, with Burgess' permission, he waited for a friend. While Cameron had heard of Burnett as a professional soccer player, they had never met until that night. Cameron said he did not know how Burnett came to be in Burgess' apartment or how long Burnett had been there.

This testimony was presented at a hearing on defendants' motions to suppress all of the evidence that the police found in the apartment. The defendants claimed that the police had engaged in an unlawful search and seizure and had acted without probable cause. Crediting the prosecution testimony, the district judge denied the suppression motions on October 26, 1988. *United States v. Burnett, et al.*, Crim. No. 88–0281 (D.D.C. Oct. 26, 1988) (memorandum order denying defendants' motions to suppress evidence) (reprinted as Addendum to Brief for the United States) [hereinafter cited as Admissibility Order]. On November 14, 1988, Parris and Cameron each pled guilty to one count of conspiracy against the United States in violation of 18 U.S.C. § 371 (1982). Hall failed to appear at the suppression hearing and has remained a fugitive since then.

At trial, in December, Burnett himself testified. He claimed that on June 27 he had traveled down to Washington with Parris and Hall; that Parris had put Burnett's clothing in Parris' tote bag; and that the next morning, he, Burnett, had removed his clothes from the bag but did not check to see what else the bag contained. He claimed that he never saw the cash or drugs in the bag, and did not know how his wallet wound up there.

The prosecution also presented testimony at trial that inside the rear pocket of a pair of jeans in the tote bag, the police found a wallet containing Burnett's social security card, voter registration card, driving permit, and paycheck stub. Burnett's fingerprints were also found on the large plastic bag containing the smaller bags of cocaine. An MPD expert testified that the amount of cash and drugs found in the apartment suggested that the apartment served as a stash house that was part of a drug distribution operation.

On December 14, 1988, the jury found Burnett guilty of the drug offense but acquitted him of the firearms charge. On January 31, 1989, he was sentenced to ten years' imprisonment followed by five years' supervised release. Burnett filed a notice of appeal on February 13, 1989. We now consider his three claims on appeal.

## II. FOURTH AMENDMENT ISSUES

Burnett claims that the police seizure of the tote bag was illegal because the officers were violating his fourth amendment-based legitimate expectation of privacy when the bag came into their plain view. Consequently, Burnett maintains that the district court erred in refusing to suppress the plain view evidence.

### A. *Fourth Amendment Methodology*

The Supreme Court has laid out the methodology that we follow in analyzing assertions of fourth amendment violations. Our primary task is to determine whether "an unlawful search or seizure violated the defendant's own constitutional rights." *United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980). To this end, the Court has instructed that the defendant's constitutional rights are violated "only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party." *Id.* (emphasis in original) (citing *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)).[3] Thus, before we

---

**3.** *Rakas* itself narrowed the scope of persons who can properly assert fourth amendment

may evaluate the alleged unconstitutionality of police activity we must first decide whether the police infringed the defendant's legitimate expectation of privacy.[4] *See Rawlings v. Kentucky,* 448 U.S. 98, 111–12, 100 S.Ct. 2556, 2564–65, 65 L.Ed.2d 633 (1980) (Blackmun, J., concurring).

## B. *Legitimate Expectation of Privacy*

### 1. *General Considerations*

We next examine the issues relevant to whether Burnett's expectation of privacy was a legitimate one. The critical question is whether Burnett had "a reasonable expectation that uninvited and unauthorized persons [would] not intrude into a particular area." *United States v. Lyons,* 706 F.2d 321, 325 (D.C.Cir.1983). Following the Fifth Circuit's lead, this court has spelled out the factors that we should consider in determining whether a person has a legitimate expectation of privacy in a place other than his own home. Those criteria, which provide a gauge for the test laid out in *Lyons,* are:

> whether the defendant has a [property or] possessory interest in the thing seized or the place searched, whether he has the right to exclude others from the place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.

*United States v. Robinson,* 698 F.2d 448, 454 (D.C.Cir.1983) (citing *United States v.*

rights from those "legitimately on premises," *Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), to those with a "legitimate expectation of privacy," *Rakas,* 439 U.S. at 143, 99 S.Ct. at 430. The Court has continued to hone that standard, overruling automatic standing for possessors of seized goods, *United States v. Salvucci,* 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980), and determining that ownership alone is insufficient to support a legitimate expectation of privacy, *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980).

4. The Supreme Court has expressed its reluctance to characterize this first inquiry in terms of standing, and has chosen to treat this inquiry instead as a "substantive" fourth amendment issue. *Rakas,* 439 U.S. at 140, 99 S.Ct. at 429.

*Haydel,* 649 F.2d 1152, 1155 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982)).[5]

A visitor's expectation of privacy is particularly tenuous in an apartment's common areas. A third party possessing "common authority over or other sufficient relationship to the premises or effects sought to be inspected" may validly consent to a police search of those premises or effects. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Cohabitants, therefore, assume the risk that one of their number "might permit the common area to be searched." *Id.* n. 7; *see also Donovan v. A.A. Beiro Construction Co., Inc.,* 746 F.2d 894, 899 (D.C. Cir.1984). Since the crucial evidence in this case came into the officers' plain view while they were standing in the apartment hallway, the core issue here is whether Burnett had a legitimate expectation of privacy in the hallway. Burnett bears the burden of proving that he in fact had that legitimate expectation. *Rawlings,* 448 U.S. at 104, 100 S.Ct. at 2561.

### 2. *Burnett's Expectation of Privacy in the Hallway*

■ We now consider Burnett's claim to an expectation of privacy in the hallway in light of the *Robinson* factors.

(a) *Burnett's Property Interest:* Unlike Wanda Burgess, the apartment lessee, Burnett, apparently a casual visitor, did not enjoy a property interest in the hallway.

5. In *Robinson,* the police entered a rooming house with an arrest warrant for a Howard Parker over the protests of the house owner, who claimed that Parker was not there. While conducting a room-by-room search for Parker, the police found Robinson lying face-down on a bed in a room with another person and arrested him. In the absence of evidence on how long Robinson had been in the house, whether he had a key, or the nature of his relationship to the owner, the court found that Robinson had no expectation of privacy in the house and therefore could not challenge either the search of the premises or his arrest therein. 698 F.2d at 450, 454–55.

So far as the record shows, even if invitees were staying in the apartment, only Burgess possessed a "sufficient relationship" to the apartment to control access to its common areas, including the hallway. *Cf. Matlock,* 415 U.S. at 171, 94 S.Ct. at 993 (consent given by lessees' daughter to search room that she and her absent husband, defendant in the case, occupied); *United States v. Hendrix,* 595 F.2d 883, 885 (D.C.Cir.1979) (appellant's wife has authority to consent to search even though appellant present at time of search). Since Burgess, by virtue of her property rights, *could have* consented to a police search of the hallway, Burnett cannot claim that he legitimately expected privacy from the police in the hallway.

(b) *Burnett's Right to Exclude Others from the Hallway:* There is no suggestion in the record that Burnett had a right to exclude from the hallway anyone lawfully in the apartment. In fact, the hallway directly adjoined the living room, so that there was no clearly defined boundary between the two areas. Presumably, any lawful occupant could have toured the hallway anytime he wanted. Burnett's claim that Cameron did not sleep in a bedroom because he was "excluded" from the rear section of the apartment, Brief for Appellant (Burnett Br.) at 21, has no support in the record. Furthermore, Burnett had no apparent authority to exclude from the hallway invitees of Burgess, Cameron, Parris, or Hall. In short, the presence of several other transient guests with undefined status in the apartment, with the lessee absent, necessarily diminished to the vanishing point any expectation on Bur-

nett's part of privacy in the apartment's common areas. *See United States v. Briones–Garza,* 680 F.2d 417, 420–23 (5th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 181 (1982).

Burnett's lack of authority to exclude other guests from the hallway did not, however, necessarily mean that he could not exclude police from the hallway under any circumstances, just as he might have resisted a burglar or a trespasser. *See generally United States v. Most,* 876 F.2d 191, 198–99 (D.C.Cir.1989) (person may relinquish expectation of privacy vis-a-vis bailee or colleague while retaining expectation vis-a-vis police). Burnett could legitimately expect the police not to enter the apartment without a warrant or other justification for a warrantless search, such as consent. *See generally Skinner v. Railway Labor Executives' Ass'n,* —— U.S. ——, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989) ("Except in certain well-defined circumstances, a search or seizure in such a [criminal] case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause."); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (discussing consensual searches).[6] Yet Burnett's right to exclude the police was a highly circumscribed one, subject to contrary decisions by Burgess—and, possibly, by other guests to whom she had delegated authority—to allow the police into the apartment's common areas.[7] Since Burnett was unsure of the status of the other guests in the apartment or, at the time of the police entry, of the whereabouts of the lessee,[8] he had no reason to expect that such consensual entry of the police might

---

**6.** Since we are inquiring only into Burnett's *expectation* of privacy, we need not reach the question of whether Cameron actually consented to the police search and, if so, whether his consent was valid. The district court made no finding on this issue. *See* Admissibility Order.

**7.** While the Supreme Court has instructed us to avoid "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like" in fourth amendment cases, *Rakas,* 439 U.S. at 143, 99 S.Ct. at 430, we find that some basic status distinctions are relevant in the fourth amendment context. Thus, we stress the narrow nature of our holding. Had the defen-

dant here been the lessee, he might well have had a legitimate expectation of privacy from the police even in the apartment's common areas. Alternatively, had the police actually entered Burnett's bedroom, his claim to a legitimate expectation of privacy would have been much stronger.

**8.** At trial, Burnett testified that Parris, who is his cousin, introduced him to Burgess as Hall's aunt. Burnett stated that he had never met Burgess previously, and had met Hall only twice before. Tr. 55–56 (Dec. 13, 1988).

not take place, as indeed it apparently did. Following the MPD officers' peaceful entry, he had no reason to doubt the police's legitimate presence in the hallway or to exclude the officers from it.

(c) *Burnett's Subjective Expectation of Privacy:* Burnett's decision to keep the door to his room open, so that he could be partially seen from the living room, suggests that he had no significant subjective expectation that third parties, including the police, would not look into his room. Additionally, since Burnett left his belongings in the tote bag, it was likely that Parris and Hall would have to go through them in order to find their own possessions. Had Burnett's subjective expectation of privacy been more pronounced, he would, presumably, have closed the door to the bedroom in which he was staying and brought his personal effects there.

(d) *Burnett's Precautions to Protect his Privacy:* By keeping his bedroom door open and his belongings in the tote bag in Parris' room, Burnett failed to take basic precautions to maintain his privacy. Indeed, it appears that Burnett took no precautions to protect his privacy.

(e) *Legitimacy of Burnett's Presence on the Premises:* While the record in the suppression hearing contains no evidence that Burgess specifically invited Burnett into her apartment, the trial record suggests that Burnett did arrive there with Parris and Hall, who had some prior acquaintance or family relationship with Burgess. Since Burgess apparently voiced no objection to Burnett's presence on the premises, we conclude that he was there legitimately.

In sum, while Burnett apparently was legitimately in Burgess' apartment, he took no actions and possessed no property interest that would support his claim to a legitimate expectation of privacy in the hallway. Since Burnett could not protest consensual police presence in the apartment's common areas, and since the position in the hallway where the police were standing when they viewed the tote bag was immediately adja-

cent to the living room, we conclude that Burnett did not demonstrate a legitimate expectation of privacy in the hallway.

3. *Burnett's Expectation of Privacy in the Tote Bag*

■ Burnett's alternative claim is that he had a legitimate expectation of privacy through his possessory interest in the tote bag itself. We are not persuaded by this argument either. Parris' ownership of the bag undermines Burnett's possessory interest in it. *Compare United States v. Salazar,* 805 F.2d 1394, 1396 (9th Cir.1986) (defendant's assertion of ownership of container out of sight in car strengthens his argument for standing to challenge search). Since the bag was in the other bedroom, Burnett had at best limited rights to exclude others from it. By not removing his belongings from the bag, Burnett failed to take normal precautions to maintain his privacy in the bag and exhibited a very low subjective expectation of privacy in it. Burnett's claim to an expectation of privacy in the bag would have been much stronger had the bag been located in the room in which the police found him. *See United States v. Robertson,* 606 F.2d 853, 858 n. 2 (9th Cir.1979). As Parris' confederate, Burnett might even have been able to make out a legitimate expectation of privacy in Parris' tote bag had it been stored in a private place. Since the officers discovered the bag in plain view, Parris clearly had not taken the precautions necessary to ensure Burnett's reasonable expectation of privacy in the bag. *Cf. United States v. Brown,* 731 F.2d 1491, 1496 (11th Cir.), *modified,* 743 F.2d 1505, 1507–08 (1984) (ultimately finding that while defendant has no legitimate expectation of privacy in body of confederate who had strapped drugs thereto, defendant might have had such expectation in less private place).

Thus, we find that Burnett enjoyed no legitimate expectation of privacy that was violated by police action. We hold, therefore, that he cannot make out a claim of injury to his fourth amendment interests.[9]

---

9. Burnett contends that the district court failed to consider the entire record—including Camer-

on's testimony—before determining that Burnett had no legitimate expectation of privacy

### III. SUPPRESSION HEARING TESTIMONY

During the suppression hearing, the trial judge sustained the prosecution's objections to two questions asked of Cameron by Burnett's counsel. The questions involved Cameron's knowledge of whether Burnett was an invited guest of Wanda Burgess. The following exchanges took place, with Burnett's lawyer posing the questions to Cameron:

Q. To the best of your knowledge, Mr. Burnett was also invited to stay in that apartment, wasn't he?

MR. FREDERICKSEN [Prosecutor]: Objection. There is no foundation.

THE COURT: Sustained.

BY MR. CRAWFORD [Burnett's counsel]:

Q. Did you have conversations with Ms. Wanda [Burgess] who rented the apartment?

A. Yeah. I spoke to her when I came in the apartment.

Q. From your conversations with her was it also your understanding that Mr. Burnett was also an invited guest?

MR. FREDERICKSEN: Objection, Your Honor, lack of foundation.

THE COURT: Sustained.

Mot. Tr. at 201–02. Earlier in the hearing, however, Cameron had testified in response to a question by the prosecutor that he did not know "[h]ow is it Mr. Burnett is at Wanda Burgess' place." Mot. Tr. at 190. Burnett claims that the judge improperly impeded his ability to establish Burnett's

precise status in Burgess' apartment. Burnett Br. at 31–33. Reviewing the trial judge's determinations for clear error, J. Hall, *Search and Seizure*, § 27:4 (1982) (citing cases), we dismiss Burnett's contention.

■ Our analysis proceeds under the rubric of Federal Rule of Evidence 104.[10] Normally, the admissibility of a witness' testimony depends on proof of the witness' firsthand knowledge of the events he will describe. Fed.R.Evid. 602. Admissibility is governed by Rule 104(b), which states that in making preliminary admissibility determinations, the judge "shall admit" the testimony upon or subject to a showing that the witness in fact had the requisite personal knowledge. *See also McCormick on Evidence* § 69 n. 1 (E. Cleary ed. 1984). A judge may determine, however, that no evidence, or at least not the evidence proffered, would "fulfill[ ] . . . the condition" of the witness' firsthand knowledge. *See Rules of Evidence for United States Courts and Magistrates*, 56 F.R.D. 183, 198 (1972) (Advisory Committee Note to Fed.R.Evid. 104(b)) (trial judge "makes a preliminary determination whether the foundation evidence is sufficient to support a finding of fulfillment of the condition"). In short, except in the extraordinary situation of plain error, no error can be claimed if at the time of the judge's ruling the counsel had made no offer of proof that would have fulfilled the condition. Fed.R. Evid. 103(a)(2), (d).[11]

requiring the suppression of the seized physical evidence. The organization of the court's memorandum denying the defendants' suppression motions suggests that the trial judge may have considered only each defendant's testimony or silence in ruling on that defendant's motion to suppress. *See generally* Admissibility Order. Since we find that even on the whole record Burnett did not sustain his burden of demonstrating his legitimate expectation of privacy in the hallway or the tote bag, any prejudicial effect on the defendants resulting from the judge's approach is harmless.

10. Federal Rule of Evidence 104 states in relevant part:
(a) *Questions of admissibility generally.*—Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence

shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
(b) *Relevancy conditioned on fact.*—When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

11. Federal Rule of Evidence 103 states in relevant part:
(a) *Effect of erroneous ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(1) Objection.—In case the ruling is one admitting evidence, a timely objection or motion

The court's ruling sustaining the first objection was appropriate. Cameron had already testified that he had no first-hand knowledge of Burnett's status in Burgess' apartment. While it is conceivable that on requestioning Cameron might have altered the answer he had already provided the prosecutor, no proffer was made that he would do so. In the absence of any showing by Burnett's counsel that Cameron actually had personal knowledge of Burnett's guest status, the judge acted within her discretion in sustaining the objection.

The judge's ruling on the second objection was more problematical. Having established that Cameron had engaged in conversations with Burgess, Burnett's counsel had introduced evidence to support a finding that those conversations gave Cameron a basis for his understanding about Burnett's status. Rather than asking about Cameron's "understanding," Burnett's counsel should have more appropriately directed his question to the content of the conversations. Although on balance, Cameron probably should have been allowed to answer the question, the judge's exclusion of his answer was harmless. *See* Fed.R.Evid. 103(d); S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 16 (1986) (discussing plain and harmless error in context of Fed.R.Evid. 103). Burnett's decision to keep the door to his bedroom open and his belongings in a bag in another room suggests that his expectation of privacy in the apartment was low. Even if Cameron had validated Burnett's guest status, that recognition alone would not have provided a basis for Burnett's legitimate expectation of privacy in the hallway or in the tote bag. Consequently, the judge's

refusal to permit the question is not a cause for reversal or remand.

IV. THE PROSECUTION'S CLOSING ARGUMENTS

During his closing argument at trial, Burnett's counsel stated:

But the problem with the Government's case is the wrong person is on trial here. Frank Parris—that's the man that should be here. That's the man that should be on trial here.... [I]t's too bad Frank Parris isn't here today. He is the guilty party.

Tr. II–18, 26 (Dec. 13, 1988).[12] In rebuttal, the prosecutor said:

You know, what do you think Frank Parris would, if he were on trial on another day by himself, would say in front of a jury—if he was just by himself. What do you think he would have to say about the fact that Mr. Burnett's clothes are in this bag with the drugs and cash? Mr. Burnett's wallet is in the bag with the drugs and cash? Mr. Burnett's fingerprints are on the bag with the drugs?— What do you think he would have to say about that?

*Id.* at II–27. Burnett contends that the prosecutor's statement amounted to an improper "missing witness" argument and thereby constituted reversible error. Burnett Br. at 37–41.[13]

We find Burnett's contention meritless because it ignores the well-established "principle that prosecutorial comment must be examined in context." *United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988) (citing *Lockett v. Ohio,* 438 U.S. 586, 595, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978)). We look at

to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

(2) Offer of proof.—In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked....

(d) *Plain error.*—Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

**12.** Parris had pled guilty about a month before Burnett's trial.

**13.** A "missing witness" argument permits an inference that the testimony of an absent witness would have been unfavorable to the opposing party. Such arguments are prohibited if the opposing party did not "peculiarly" have the power to produce the missing witness or if the missing witness' testimony would not "elucidate the transaction." *United States v. Young,* 463 F.2d 934, 939–40 (D.C.Cir.1972).

the entire proceeding to see whether the prosecutor manipulated or misstated evidence or otherwise violated rights of the accused. We are particularly chary of finding the prosecutor's statements unduly prejudicial when "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense." *Darden v. Wainwright,* 477 U.S. 168, 182, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); *see generally United States v. Young,* 470 U.S. 1, 14–19, 105 S.Ct. 1038, 1045–48, 84 L.Ed.2d 1 (1985). And, since defense counsel failed to object at trial to the prosecutor's statements, we can reverse Burnett's conviction only if plain error occurred. Fed.R.Crim.P. 52(b).

We think it apparent that the prosecutor's comments were invited by—and responded to—defense counsel's remarks about Parris' being the "man that should be on trial here"; they were not conceived—nor in context would they be perceived—as a missing witness argument. Indeed, it seems incongruous for Burnett's counsel to claim that the prosecutor was asking the jury to draw an improper inference about the testimony of a missing witness when it was he who first suggested that Parris' absence tainted Burnett's trial. The prosecutor's retort is most reasonably read as saying that Parris' absence had no bearing on the outcome of Burnett's trial; that the jurors should not shift blame from Burnett to Parris; and that justice required a guilty verdict against Burnett, regardless of Parris' presence or absence at Burnett's trial.[14]

## V. CONCLUSION

We conclude that (1) Burnett's fourth amendment rights were not violated by the admission of physical evidence that came into the police officers' plain view during their search of the apartment; (2) the trial judge's evidentiary rulings during the suppression hearing were not cause for reversal or remand; and (3) the prosecutor's

closing argument did not deny defendant a fair trial. Burnett's conviction is

*Affirmed.*

---

**14.** Since we hold that the prosecutor's remarks did not constitute an improper missing witness argument, we need not reach the question of whether the trial judge's failure to issue a cautionary instruction amounted to plain error. *Compare Young,* 463 F.2d at 943.