# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 14, 2016　　　Decided December 13, 2016

No. 14-7129

REUVEN GILMORE, INDIVIDUALLY, AS THE ADMINISTRATOR OF
THE ESTATE OF ESH KODESH GILMORE AND AS NATURAL
GUARDIAN OF PLAINTIFFS ELIANA GILMORE AND DROR
GILMORE, ET AL.,
APPELLANTS

v.

PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY, ALSO
KNOWN AS PALESTINIAN NATIONAL AUTHORITY, ALSO KNOWN
AS PALESTINIAN AUTHORITY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:01-cv-00853)

———

*Kent A. Yalowitz* argued the cause for appellants. With
him on the briefs were *Robert J. Tolchin* and *Meir Katz.*

*Mitchell R. Berger* argued the cause for appellees The
Palestinian Authority and Palestine Liberation Organization.
With him on the brief were *Pierre H. Bergeron*, *John A.
Burlingame*, *Alexandra E. Chopin*, and *Gassan A. Baloul.*

Before: GRIFFITH and WILKINS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Esh Kodesh Gilmore ("Gilmore"), a United States national, was killed in a shooting attack in Jerusalem on October 30, 2000. His family members and estate (collectively, "Appellants") filed suit against the Palestinian Interim Self-Government Authority ("PA") and the Palestine Liberation Organization ("PLO") (collectively, "Appellees") asserting claims under the Anti-Terrorism Act, 18 U.S.C. § 2333, and related common law theories.

After years of litigation, the District Court granted summary judgment in favor of Appellees. Appellants challenge the judgment, along with the vacatur of Appellees' defaults and the denial of Appellants' motion to compel the production of intelligence materials. Appellees challenge the District Court's denial of a motion for judgment on the pleadings for lack of personal jurisdiction. We have jurisdiction to review the final decisions of the District Court under 28 U.S.C. § 1291. For the reasons set forth below, we affirm each of the District Court's challenged orders.

## I.

Gilmore was a private security guard at an East Jerusalem branch office of the National Insurance Institute of Israel. On October 30, 2000, he was shot and killed while on duty. The State of Israel has not prosecuted or convicted anyone in connection with the shooting.

Appellants filed suit against Appellees and individual defendants on April 18, 2001. Appellees "failed to plead or

otherwise defend th[e] action," so default was entered against them on December 20, 2001. J.A. 85. A month and a half later, Appellees moved to vacate the default. Appellees and individual defendants also moved to dismiss, arguing (1) the suit was a politically-motivated attack on the PA and therefore non-justiciable, (2) "Palestine [was] a state under U.S. and international law" and therefore Appellees were entitled to sovereign immunity, and (3) "[p]ersonal [j]urisdiction [was] [l]acking [o]ver the [i]ndividual [d]efendants." J.A. 85.9-85.31. The District Court vacated the default "in light of the strong preference in this jurisdiction for rulings on the merits." J.A. 86. For a variety of reasons, however, the District Court did not rule on the motion to dismiss until March 7, 2006, when it granted the motion as to the individual defendants but denied the motion as to Appellees.

After the ruling, Appellees failed to file a timely answer. The District Court again entered default against Appellees on January 29, 2007. Over the summer of 2007, the District Court held damages hearings at which Gilmore's family testified. On November 15, 2007, Appellees moved to vacate the second default and filed an answer. In a declaration submitted with the motion, the PA's Prime Minister, Salam Fayyad, explained that he "became aware" of a letter from U.S. Secretary of State Condoleezza Rice, which encouraged Appellees to "respond to U.S. legal proceedings in a good faith and a timely manner." Decl. of Salam Fayyad ¶ 11, J.A. 130. Prime Minister Fayyad assured the District Court that he "instructed new counsel that [Appellees] will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process." *Id.* ¶ 13, J.A. 130. On December 28, 2009, the District Court vacated the second default and, to mitigate prejudice to Appellants, ordered Appellees to: (1) reimburse Appellants for attorneys'

fees and costs incurred as a result of the default, (2) stipulate that Appellants "need not testify again and that their testimony from the damages hearing may be read into the trial record," and (3) post a $1 million bond. J.A. 155-174.

Following years of discovery, Appellees submitted a privilege log to Appellants on March 4, 2013. The log disclosed twenty-five pages of material generated by the PA's intelligence agency, the General Intelligence Services ("GIS"), which were withheld under the state-secrets and law-enforcement privileges. Appellants moved to compel the production of those materials, arguing principally that Appellees should produce the GIS materials, and alternatively that the District Court should "conduct an *in camera* review of the documents to determine whether any privileges apply." J.A. 240-258. At a status conference, Appellees argued that *ex parte* briefing would need to accompany *in camera* review because it would be "very difficult for [the District Court] to review the documents and reach an assessment of them without additional information that should not be disclosed publically or to [Appellants]." Mot. Hr'g Tr. 14:19-24, J.A. 296. The District Court subsequently ordered Appellees to file, sealed and *ex parte*, the GIS materials and "an explanatory Memorandum of those documents, not to exceed 10 pages." J.A. 282. On June 6, 2013, following *in camera* review aided by Appellees' *ex parte* briefing, the District Court denied Appellants' motion to compel the production of the twenty-five pages of GIS materials. The District Court also denied Appellants' motion to unseal the memorandum submitted *ex parte* by Appellees.

Appellees subsequently moved for summary judgment, arguing that at the close of fact discovery, Appellants had no admissible evidence linking Gilmore's murder to any particular person, let alone Appellees. Appellants argued that

Gilmore was killed by Muhanad Abu Halawa ("Halawa"), a deceased former soldier in the PA's security apparatus known as "Force 17," and that Appellees were vicariously liable for Halawa's actions. In support of that theory, Appellants proffered the following evidence:

- Two statements published online by the Israel Ministry of Foreign Affairs;
- A passage from a non-fiction book entitled *The Seventh War*, which recounted a prison interview that implicated Halawa;
- A statement by one of Halawa's associates, which was written and signed while in the custody of Israeli police;
- The testimony of Halawa's colleague during the trial of Halawa's supervisor; and
- An expert report authored by a former intelligence officer of the Israel Defense Forces.

The District Court declared this evidence inadmissible, and granted Appellees' motion for summary judgment.

## II.

Appellees urge this Court to "affirm the judgment below on the alternative ground that the court below lacked personal jurisdiction over [them]." Appellees' Br. at 52. We address this argument first. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."). We conclude that Appellees have waived their challenges to personal jurisdiction.

"It is . . . elementary that a defense of . . . lack of personal (as opposed to subject matter) jurisdiction is waived unless the defense is asserted by a pre-answer motion (*i.e.*, Rule 12(b)) or in a responsive pleading, *i.e.*, the answer or a timely amendment thereto." *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 813 (D.C. Cir. 1988) (en banc) (citing FED. R. CIV. P. 12(h)(1), and 5C CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 1388 (2d ed. 1969)).

In their pre-answer motion, Appellees argued that "Palestine [was] a state under U.S. and international law" and, therefore, they were entitled to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"). J.A. 85.24. Appellees now raise a constitutional personal-jurisdiction defense, which they argue was preserved by their invocation of the FSIA. At oral argument, Appellees insisted that "a sovereign immunity challenge is a challenge to both personal jurisdiction and subject matter jurisdiction," and a "substantial jurisdictional challenge" should not be deemed waived just "because the motion said 'sovereign immunity' and did not articulate the words 'personal jurisdiction.'" Oral Arg. at 22:50-23:45.

This argument is foreclosed by *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990). In *Foremost-McKesson*, Iran went a step further than Appellees: it expressly argued that "[b]ecause under the FSIA personal jurisdiction cannot exist unless there is subject-matter jurisdiction, . . . the Court also lacks personal jurisdiction," *id.* at 453; in other words, Iran *did* "articulate the words 'personal jurisdiction.'" This Court, however, rejected Iran's argument because statutory and constitutional grounds for personal jurisdiction are different – a court must have both to hear a case. Accordingly, we held that a "defense resting on

personal jurisdiction involv[ing] a *statutory* claim" does not preserve "the separate constitutional ground for a claim of lack of *in personam* jurisdiction." *Id.* This reasoning applies with equal force here: in their 2002 motion to dismiss, Appellees' "only defense resting on personal jurisdiction involved" the FSIA and, therefore, they have waived "the separate constitutional ground for a claim of lack of *in personam* jurisdiction." *Id.*

Appellees also argue that their personal-jurisdiction defense was not "available" to them until the Supreme Court's decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). "[A] party is only required to consolidate Rule 12 defenses and objections that are 'then available to the party.'" 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1388 (3d ed. 2014) (quoting FED. R. CIV. P. 12(g)). A defense is "available" unless "its legal basis did not exist at the time of the answer or pre-answer motion, or the complaint does not contain facts sufficient to indicate that a defense was possible." *Chatman-Bey*, 864 F.2d at 813 n.9 (citations omitted). At the time of Appellees' pre-answer motion in 2002, the "legal basis" for their personal-jurisdiction defense did exist; there was no Supreme Court or in-circuit precedent rendering the personal-jurisdiction defense "for all practical purposes impossible for the defendants to interpose." *Id.* In other words, the defense was "available" at the time.

An examination of the Second Circuit's recent decision in *Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016) illustrates the point. Second Circuit precedent "permitted general jurisdiction on the basis that a foreign corporation was doing business through a location branch office in the forum." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (citations omitted). The PA

and PLO were arguably "doing business through a location branch office." *See Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 51-52 (2d Cir. 1991) (noting that the PLO owned a building in Manhattan that it used as an office). Consequently, in the Second Circuit, the "legal basis" for the PA and PLO's personal-jurisdiction defense arguably "did not exist at the time" while this precedent was controlling. *See Chatman-Bey*, 864 F.2d at 813 n.9. In *Daimler*, the Supreme Court "expressly cast doubt on" that Second Circuit precedent. *Gucci*, 768 F.3d at 135. Accordingly, the Second Circuit held that the PA and PLO "did not waive or forfeit their objection to personal jurisdiction" because the objection was not "available" before *Daimler*. *Waldman*, 835 F.3d at 328.

No similar precedent existed in this Circuit and, therefore, the "legal basis" for Appellees' personal-jurisdiction defense did exist at the time; the defense was "available." *See Chatman-Bey*, 864 F.2d at 813 n.9. Therefore, Appellees waived their personal-jurisdiction defense by failing to assert it in their pre-answer motion.

## III.

We next turn to the District Court's vacatur of two defaults, which we review "for abuse of discretion, keeping in mind the federal policy favoring trial over default judgment." *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995).

Appellants argue that Appellees were "essentially unresponsive" prior to the entry of two defaults, and that "should have been the end of the [District Court's] inquiry." Appellants' Br. at 31-32. The Federal Rules of Civil Procedure delineate the standards governing the entry and vacatur of defaults and default judgments. *See* FED. R. CIV. P.

55(a) (entering defaults), 55(b) (entering default judgments), 55(c) (vacating defaults), 60(b) (vacating default judgments). In *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689 (D.C. Cir. 1970), this Court articulated the policy reasons for allowing default judgments: "when the adversary process has been halted because of an essentially unresponsive party . . . ., the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights." *Id.* at 691; *see* 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2681 (3d ed. 2016) (discussing *H.F. Livermore* as an "apt expression" of the "policy reasons for allowing default judgments"). However, the rationale for entering default judgments does not govern the analysis for vacating defaults; this Court has never held that when a defendant has been "essentially unresponsive," courts are *forbidden* from vacating defaults.[1]

Rather, district courts may vacate "an entry of default for good cause." FED. R. CIV. P. 55(c). The "good cause" standard "frees a court . . . from the restraints of Rule 60(b) [conditions for vacating default judgments] and entrusts the determination to the discretion of the court." 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE FEDERAL PRACTICE AND PROCEDURE § 2694 (3d ed. 2016). "[E]xercise of that discretion entails consideration of whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious . . . ." *Keegel v. Key W. & Caribbean Trading*, 627 F.2d 372, 373 (D.C. Cir. 1980) (citations omitted).

---

[1] Indeed, even default judgments may be vacated when the defaulting party was, for some period of time, "essentially unresponsive." *See* FED. R. CIV. P. 60(b) (listing several conditions unrelated to responsiveness or willfulness).

10

Following the *Keegel* framework, the District Court first found that Appellees' defaults were willful. Second, it found that vacatur would cause prejudice to Appellants, but mitigated the prejudice by requiring Appellees to: (a) reimburse Appellants for attorneys' fees and costs incurred as a result of the default, (b) stipulate that Appellants "need not testify again and that their testimony from the damages hearing may be read into the trial record," and (c) post a $1 million bond. J.A. 155-174. Third, the District Court found that Appellees raised "meritorious" defenses. For the purposes of vacating defaults, "[d]efendants' allegations are meritorious if they contain even a hint of a suggestion which, proven at trial, would constitute a complete defense." *Keegel*, 627 F.2d at 375 (internal quotation marks and citations omitted). Appellees satisfied this modest requirement. Even when a default is willful, a district court does not necessarily abuse its discretion by vacating a default when the asserted defense is meritorious and the district court took steps to mitigate any prejudice to the non-defaulting party. *See, e.g.*, *Whelan*, 48 F.3d at 1258-59 (affirming the vacatur of a default as to most claims, despite "the record suggest[ing] intentional delay").

Appellants argue that the District Court abused its discretion by considering factors other than those articulated in *Keegel*. Rule 55(c)'s "good cause" determination is a balance of the equities, *Whelan*, 48 F.3d at 1259-60, that is guided principally – but not exclusively – by the *Keegel* factors. *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993) (observing that in addition to the *Keegel* factors, "[o]ther relevant equitable factors may also be considered"). The "good cause" standard is designed to empower courts to consider the equities that specially arise in a given case. *See* 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE FEDERAL PRACTICE AND

PROCEDURE § 2696 (3d ed. 2016) ("Rule 55(c) is addressed to the trial court's discretion, which is exercised in light of all the circumstances of the individual situation . . . ."). Accordingly, the District Court properly credited the equitable considerations raised by the foreign defendants in this case, and did not abuse its discretion merely because those considerations fell outside the *Keegel* framework. The District Court ultimately determined that upon consideration of all the factors – those articulated in *Keegel* and not – this matter was best resolved on the merits, which is hardly a remarkable conclusion. *See Keegel*, 627 F.2d at 375 ("[C]ourts . . . universally favor trials on the merits." (internal quotation marks and citations omitted)).

In light of the "federal policy favoring trial over default judgment," *Whelan*, 48 F.3d at 1258, we conclude the District Court did not abuse its discretion in finding "good cause" to vacate Appellees' defaults.

## IV.

We turn to consider the District Court's denial of Appellants' motion to compel the production of purportedly privileged materials, based on *in camera* review with the assistance of *ex parte* briefing.

Following years of discovery, Appellees submitted an untimely privilege log to Appellants. The log disclosed the existence of twenty-five pages of materials generated by the PA's intelligence agency, but withheld those materials as privileged. At Appellants' suggestion, the District Court reviewed the intelligence materials *in camera*. In response, Appellees explained to the District Court that it would be "very difficult . . . to review the [intelligence materials] and reach an assessment of them without additional information that should not be disclosed publically or to [Appellants]."

Mot. Hr'g Tr. 14:19-24, J.A. 296. Consequently, the District Court ordered Appellees to submit *ex parte* "an explanatory Memorandum of those documents, not to exceed 10 pages." After reviewing the twenty-five pages of intelligence materials *in camera* with the assistance of the *ex parte* memorandum, the District Court concluded that the documents offered no relevant information that was not already in Appellants' possession.

## A.

Appellants argue that by deciding the motion based on *in camera* review with the assistance of the ten-page *ex parte* memorandum, the District Court violated Appellants' Fifth Amendment due process rights.

The Supreme Court "has approved the practice of requiring parties who seek to avoid disclosures of documents to make the documents available for *in camera* inspection, and the practice is well established in the federal courts." *United States v. Zolin*, 491 U.S. 554, 569 (1989) (citations omitted).

However, *ex parte* proceedings should be employed to resolve discovery disputes only in extraordinary circumstances. *Cf. Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) (Ginsburg, R.B., J.) ("Only in the most extraordinary circumstances does our precedent countenance court reliance upon *ex parte* evidence to decide the merits of a dispute."). "The openness of judicial proceedings serves to preserve both the appearance and the reality of fairness in the adjudications of United States courts." *Id.* at 1060-61. Nevertheless, "communications between a judge and one party are not per se deprivations of the due process rights of the opposing party . . . ." *Clifford v. United States*, 136 F.3d 144, 149 (D.C. Cir. 1998) (citation omitted).

In *Clifford*, this Court catalogued some of the circumstances in which *ex parte* submissions have been permitted:

> Ex parte submissions are permissible to determine whether documents sought by a party enjoy a privilege against discovery, *see In re Application of Eisenberg*, 654 F.2d 1107, 1112 (5th Cir. Unit B 1981); *cf. Kerr v. United States Dist. Court*, 426 U.S. 394, 405 (1976), 'to prevent frustration of a statutory purpose to limit access to Government papers,' *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977), or 'to resolve fears of intimidation of a witness,' *In re Paradyne Corp.*, 803 F.2d [604][,] 612 [(11th Cir. 1986)].

136 F.3d at 149; *see also Abourezk*, 785 F.2d at 1060-61 (listing similar exceptions).

These "extraordinary circumstances" share a common feature: the need for secrecy in light of the substantial adverse consequences of disclosure. Here, Appellants sought intelligence materials generated in the midst of a geopolitical conflict. The District Court was tasked with evaluating the discoverability of those materials, which would have been challenging without proper context. In light of the sensitive nature of the disputed materials and the foreign policy implications of disclosure, this case presents one of the "extraordinary circumstances" in which it was not improper for the District Court to consider a ten-page *ex parte* explanatory memorandum. *See Abourezk*, 785 F.2d at 1060-61.

14

**B.**

Appellants also challenge the substance of the District Court's decision to deny their motion to compel. "We review district court rulings on discovery matters solely for abuse of discretion, reversing only if the party challenging the decision can show it was clearly unreasonable, arbitrary, or fanciful." *Bowie v. Maddox*, 642 F.3d 1122, 1136 (D.C. Cir. 2011) (internal quotation marks and citations omitted).

Appellants first argue that Appellees waived any privileges and, in the alternative, that no privilege protects the intelligence materials in dispute. We need not address whether Appellees properly invoked any privileges over the intelligence materials because the District Court acted within its discretion under Federal Rule of Civil Procedure 26(b). Under Rule 26(b), the scope of discovery is defined, in part, by "whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1). Indeed, "[o]n motion or on its own, [a] [district] court must limit the frequency or extent of discovery otherwise allowed . . . if it determines that . . . the discovery sought is unreasonably cumulative or duplicative . . . ." FED. R. CIV. P. 26(b)(2)(C). "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly . . . ." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).

The District Court examined the twenty-five pages of intelligence materials and concluded, as to the "likely benefit" of the proposed discovery, that the "documents had no great significance" to Appellants' claims. Then, it concluded that the proposed discovery would "undermine important interests" of Appellees, quoting *Societe Nationale Industrielle Aerospatiale v. U.S. District Court for the Southern District of Iowa*, 483 U.S. 522 (1987). Appellants argue that the District

Court erred because *Societe Nationale* applies only to sovereign states and that the Palestinian Authority is not one. But, that is beside the point; imposition on the "important interests" of Appellees is properly weighed as a "burden" under Rule 26(b), without regard to whether any party is a sovereign. *See In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1215-18 (D.C. Cir. 2004) (reversing an order granting a motion to compel because the district court failed to weigh privacy interests as a "burden" under Rule 26). The District Court, determining that the "burden" of discovery outweighed the "likely benefit" and discharging its duty to limit "unreasonably cumulative" discovery, exercised its "broad discretion [under Rule 26] to tailor discovery narrowly . . . ." *See Crawford-El*, 523 U.S. at 598.

Having reviewed the twenty-five pages of foreign intelligence materials, we conclude the District Court's decision was not "clearly unreasonable, arbitrary, or fanciful," and therefore not an abuse of discretion. *See Bowie*, 642 F.3d at 1136.

## V.

Finally, we turn to the District Court's grant of summary judgment in Appellees' favor, which was entirely predicated on rulings that deemed Appellants' evidence inadmissible hearsay.

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016) (quoting FED. R. CIV. P. 56(a)).

"[W]e review a trial court's evidentiary rulings for abuse of discretion and even if we find error, we will not reverse an

16

otherwise valid judgment unless appellant[s] demonstrate[] that such error affected [their] substantial rights." *Bowie*, 642 F.3d at 1134 (citation omitted). The District Court ruled that Appellants' evidence was inadmissible hearsay and "sheer hearsay . . . counts for nothing on summary judgment." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (internal quotation marks and citations omitted). "While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (emphasis in original).

"[E]xcept in the extraordinary situation of plain error, no error can be claimed if at the time of the judge's ruling the counsel had made no offer of proof that would have fulfilled the condition[s] [of admissibility]." *United States v. Burnett*, 890 F.2d 1233, 1240 (D.C. Cir. 1989) (citing FED. R. EVID. 103(a)(2), (d)); *see also* 5 JOSEPH M. MCLAUGHLIN, JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 103.20[5] (2d ed. 2013) ("In making an offer of proof, counsel must be careful to articulate every ground on which the evidence is admissible, since a ground not identified at trial will not provide a basis for reversal on appeal."). The requirements to articulate grounds for admissibility and to support those grounds with an offer of proof are especially pertinent where, as here, the proponent made little effort to assist the District Court in making the evidentiary rulings.

**A.**

The District Court excluded two web pages from the Israel Ministry of Foreign Affairs website, which Appellants characterized as "Israeli government reports identifying Force

17 and Abu Halawa as having executed the murder [of Gilmore], [which] are admissible under [Federal Rule of Evidence] 803(8)[]." J.A. 733.

"A record or statement of a public office" is admissible if "it sets out . . . factual findings from a legally authorized investigation[] and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." FED. R. EVID. 803(8). "Rule 803(8)[] is to be applied in a commonsense manner, subject to the district court's sound exercise of discretion . . . ." *In re Korean Air Lines Disaster*, 932 F.2d 1475, 1481 (D.C. Cir. 1991) (quotation marks and citation omitted).

At the top of each web page was the banner for the Israel Ministry of Foreign Affairs and the author of each page was identified only as "IDF [Israel Defense Forces] Spokesman." The first page offered background on Force 17, including an assertion that it was responsible for "[a] shooting attack in Jerusalem, in which a security guard was killed and another wounded (30 October)." J.A. 728. The second page announced the targeted killing of Halawa, who purportedly "took part in" Gilmore's murder. J.A. 729. The pages offer no information explaining who made the findings or how they were made.

Before the District Court, Appellants rested on a bare, one-sentence assertion that the web pages were admissible under Rule 803(8), but offered no further explication of how the pages conveyed "factual findings from a legally authorized investigation," FED. R. EVID. 803(8). Without more, the District Court did not abuse its discretion by ruling

18

that the two pages were not admissible under Rule 803(8). *See In re Korean Air Lines Disaster*, 932 F.2d at 1481.[2]

**B.**

The District Court excluded excerpts from a non-fiction book entitled *The Seventh War*, authored by an Israeli journalist, Avi Issacharoff ("Issacharoff"), who conducted an interview with a Palestinian prisoner, Karim Aweis ("Aweis"). The book excerpt offered the following account: "Halawa told Aweis that he wanted to announce to the media that he assumed responsibility for the East Jerusalem attack [killing Gilmore] on behalf of a new military wing of Fatah." J.A. 727.

This is triple hearsay: (1) Halawa's statement to Aweis, (2) Aweis's statement to Issacharoff, and (3) Issacharoff's written account. In order to be admissible, "each part of the combined statements [must] conform[] with an exception to the rule [against hearsay]." FED. R. EVID. 805. The District Court ruled that Halawa and Aweis's statements were inadmissible.

Appellants argue that Aweis's statement was a party admission because Aweis was purportedly an "employee" of the PA. A statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the

---

[2] Appellants now point to other record materials that may have supported admission under Rule 803(8). However, Appellants did not make this offer of proof to the District Court and, therefore, failed to preserve a claim of error on the basis of those materials. *See Burnett*, 890 F.2d at 1240 ("[E]xcept in the extraordinary situation of plain error, no error can be claimed if at the time of the judge's ruling the counsel had made no offer of proof that would have fulfilled the condition[s] [of admissibility].").

party's agent or employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801(d)(2)(D). At the time of his statement, Aweis was serving six life sentences in prison, but was receiving payments from the PA's Ministry of Prisoners and was purportedly continuing to receive military promotions. "Ordinarily, an agency relationship arises only where the principal has the right to control the conduct of the agent with respect to matters entrusted to the agent . . . ." *Atrium of Princeton, LLC v. NLRB*, 684 F.3d 1310, 1315 (D.C. Cir. 2012) (internal quotation marks, alterations, and citations omitted); *see also* RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (AM. LAW INST. 2006) ("The common law of agency . . . encompasses the employment relation . . . ."). Appellants did not offer any evidence that, at the time of Aweis's statement, Appellees still "ha[d] the right to control [his] . . . conduct." Therefore, the District Court did not abuse its discretion by concluding that Aweis's statement was not a party admission.

Since it was not an abuse of discretion to exclude Aweis's statement, it was also not an abuse of discretion to exclude the passage from *The Seventh War*, which recounted Aweis's statement. *See* FED. R. EVID. 805 ("[E]ach part of the combined statements [must] conform[] with an exception to the rule [against hearsay].").

## C.

The District Court excluded the statement made by Mustafa Maslamani ("Maslamani") while he was in the custody of Israeli police. Maslamani wrote and signed a statement that read: "I myself, [Halawa,] and [one other person] were in a coffeehouse in Ramallah and the three of us were talking . . . and . . . Hallawa [sic] [said that] he

perpetrated terrorist attacks," including the one that killed Gilmore. J.A. 149.

Appellants argued that this statement was admissible as a statement against interest. Assuming, without deciding, that Maslamani was "unavailable," Appellants must still demonstrate that a "reasonable person in the declarant's position" would think the statement "expose[d] the declarant to civil or criminal liability." FED. R. EVID. 804(b)(3); *accord United States v. Wilson*, 160 F.3d 732, 739 (D.C. Cir. 1998). "The rationale of the statement against interest exception is that a reasonable person will not make a damaging statement against himself or herself unless it is true." 5 JOSEPH M. MCLAUGHLIN, JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 804.06[4][c] (2d ed. 2013).

Maslamani's statement did not expose him to liability; he inculpated Halawa for Gilmore's murder while exculpating himself. Appellants argue that Maslamani's statements indicated his knowledge of and association with the criminal activities of Force 17, which exposed him to liability. However, Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson v. United States*, 512 U.S. 594, 600-01 (1994); *see also* FED. R. EVID. 804 advisory committee's note to Exception (3) ("[A] statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest."). Therefore, the District Court did not abuse its discretion by concluding that Maslamani's statement did not "expose [him] to civil or criminal liability[,]" FED. R. EVID. 804(b)(3), and was not admissible under Rule 804(b)(3).

**D.**

The District Court excluded the statement of Bashar Khatib ("Khatib"), Halawa's colleague, made during the trial of their supervisor, Mahmoud Damara ("Damara"). While in the custody of Israeli police, Khatib stated that he was the driver and Halawa was the shooter in Gilmore's murder. During the trial of Damara, Khatib testified about the custodial statements he made to the police. Later, during the deposition in this case, Khatib denied having any knowledge of Gilmore's murder and refused to explain any purported inconsistency with his testimony at trial.

Appellants argue that, at trial, Khatib confirmed the veracity of his custodial statement and, therefore, the trial testimony is admissible as a prior inconsistent statement "because Khatib repudiated that sworn trial testimony in his deposition in this case." A statement is not hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." FED. R. EVID. 801(d)(1)(A).

Appellants try to invoke Rule 801(d)(1)(A) based on a purported inconsistency between Khatib's deposition testimony in this case and his prior trial testimony in Damara's Israeli trial. Appellees argue that the statement fails to meet the requirements of the hearsay exception. We need not resolve all of the intricacies of this dispute. Even assuming Rule 801(d)(1)(A) applied to this circumstance, the Rule's requirements are not met because the District Court reasonably concluded that the statements were not inconsistent. At the Israeli trial, Khatib was asked questions about a variety of incidents and people, including Halawa,

Bashir Nafa, Omar Ka'adan, and Damara. When asked about Gilmore's murder, he repeatedly insisted that it had "no connection to us" and refused to confirm his custodial statement regarding Halawa's involvement. Trial Tr. at 7, J.A. 667. Khatib was then asked: "According to what I understand from you, everything you have said about Muhannad Abu Halawa, about Bashir Nafa, Omar Ka'adan, everything is correct but whatever is related to [Damara] is incorrect. Correct?" *Id.* at 8, J.A. 669. Khatib responded: "Yes." *Id.*

Appellants argue that this one-word answer to a compound question is confirmation, contrary to the rest of Khatib's testimony, of his custodial statement implicating Halawa. The District Court found "it [was] not at all clear that . . . Khatib understood himself to be affirming the truth of his prior statements implicating . . . Halawa." J.A. 866. Given the trial testimony's lack of clarity, it was not an abuse of discretion for the District Court to conclude that Khatib's trial and deposition testimony were not inconsistent – he continuously refused to confirm his custodial statement – and that, therefore, the trial testimony could not be admitted as a prior inconsistent statement.[3]

### E.

Finally, the District Court declined to admit the report of Appellants' expert, Alon Eviatar ("Eviatar"). Eviatar, a

---

[3] Appellants now also argue that Khatib's testimony is admissible as a statement against interest and as former testimony. However, by not raising those grounds in the lower court proceedings, Appellants failed to preserve the claim of error. *See* FED. R. EVID. 103(a). Furthermore, Appellants make no attempt to explain how this case presents "the extraordinary situation of plain error" that would excuse their failure. *Burnett*, 890 F.2d at 1240.

former Israel Defense Forces intelligence officer and Department Head of Palestinian Affairs, examined all of the evidence described above and opined that it was "more likely than not that . . . Halawa carried out the October 30, 2000 murder of Mr. Gilmore."

District courts are assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The test of reliability is "flexible" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). "[T]he expert must form his own opinions by 'applying his extensive experience and a reliable methodology' to the inadmissible materials. Otherwise, the expert is simply 'repeating hearsay evidence without applying any expertise whatsoever,' a practice that allows the [proponent] to 'circumvent the rules prohibiting hearsay.'" *United States v. Mejia*, 545 F.3d 179, 197 (D.C. Cir. 2008) (quoting *United States v. Dukagjini*, 326 F.3d 45, 58-59 (2d Cir. 2002)).

The District Court found that Eviatar did not apply "a reliable methodology" to form his opinion about the inadmissible materials. Eviatar briefly described how, "as a rule," the strength of analyses are evaluated by: "(i) the nature and/or quality of the available information and data; (ii) the variety and diversity of the sources and/or types of information and data; and (iii) cumulative experience and knowledge and professional instincts and intuition." Expert Report at 13, J.A. 899. However, he did not explain how this methodology led to his opinions. It was also unclear how Eviatar's approach differed from that of a layperson; "where

the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use opinion evidence for the purpose." *Henkel v. Varner*, 138 F.2d 934, 935 (D.C. Cir. 1943). Therefore, in light of the "broad latitude" to decide how to determine reliability, *Kumho*, 526 U.S. at 141-42, it was not an abuse of discretion for the District Court to deny the admission of Eviatar's expert report.

## F.

In sum, the District Court did not abuse its discretion in excluding Appellants' evidence. The only evidence connecting Halawa – and, therefore, Appellees – to Gilmore's murder is inadmissible hearsay. "[S]heer hearsay . . . counts for nothing on summary judgment." *Greer*, 505 F.3d at 1315. Accordingly, the District Court did not err in granting summary judgment in favor of Appellees. *See* FED. R. CIV. P. 56(a).

## VI.

For the foregoing reasons, we affirm the judgment of the District Court.

*So ordered.*